UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10038-RGS

AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS

v.

KATHLEEN SEBELIUS, et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

March 22, 2010

STEARNS, D.J.

On January 12, 2009, the American Civil Liberties Union of Massachusetts (ACLU) brought this lawsuit against officials of the U.S. Department of Health and Human Services (HHS), alleging that defendants are violating the Establishment Clause of the First Amendment by allowing the United States Conference of Catholic Bishops (USCCB) to impose a religion-based restriction on the disbursement of taxpayer-funded services.[1] On May 15, 2009, defendants filed a motion to dismiss for lack of subject matter jurisdiction. A hearing on the motion was held on December 3, 2009.[2]

BACKGROUND

The facts, viewed in the light most favorable to the ACLU as the non-moving party, are as follows.  In 2000, with the noble goal of suppressing human trafficking, Congress

---

[1]The Complaint originally named Michael O. Leavitt, the former Secretary of HHS. Leavitt's successor, Kathleen Sebelius, has been substituted as a defendant.

[2]In recognition of the importance of the issue, the parties dispatched two very able young advocates, Brigitte Amiri for the ACLU, and Peter Phipps for the government, to argue the case.

passed the Trafficking Victims Protection Act (TVPA), 22 U.S.C. § 7105, *et seq.*[3]  The

TVPA included a provision directing HHS to "expand benefits and services to victims of

severe forms of trafficking in persons in the United States . . . ." 22 U.S.C. § 7105(b)(1)(B).

Congress initially funded the mandate by appropriating $5 million for victims' services in

fiscal year 2001 and $10 million in fiscal year 2002.  Congress has since appropriated up

to $12.5 million for each of the fiscal years 2008 through 2011.

HHS initially implemented the victims' services mandate of the TVPA by making

grants to private providers on a case-by-case basis.  In November of 2005, HHS decided

to award a master contract to a single provider on a per capita basis.  On February 23,

2006, the USCCB submitted a proposal to HHS to enlist non-governmental organizations

(NGOs) under its oversight umbrella.[4]  However, the USCCB added a caveat:

> [A]s we are a Catholic organization, we need to ensure that our victim
> services funds are not used to refer or fund activities that would be contrary
> to our moral convictions and religious beliefs.  Therefore, we would explain
> to potential subcontractors our disclaimer of the parameters within which we
> can work.  Specifically, subcontractors could not provide or refer [victims] for
> abortion services or contraceptive materials . . . .

Compl. ¶ 46.[5]  HHS sought to clarify this "conscience exception" by asking the USCCB,

---

[3]The TVPA was reauthorized in 2003, 2005, and 2008.  See William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 112 Stat.
5044 (2008).  William Wilberforce was an English politician and social reformer whose
campaign to suppress the slave trade led to the passage by Parliament of the Slavery
Abolition Act of 1833, ending the institution of slavery in the British Empire.

[4]The USCCB's purposes include to "unify, coordinate, encourage, promote and
carry on Catholic activities in the United States" and to "organize and conduct religious,
charitable and social welfare work at home and abroad."  Compl. ¶ 41.

[5]HHS's Request for Proposal made no reference to contraception or abortion
services.  The USCCB presumably raised the issue because abortions and contraceptive

"Would a 'don't ask, don't tell' policy work regarding the exception?  What if a subcontractor referred victims supported by stipend to a third-party agency for such services?"  Id. at ¶ 49.  The USCCB responded unequivocally.  "We cannot be associated with an agency that performs abortions or offers contraceptives to our clients.  If they sign the written agreement [the subcontract], the 'don't ask, don't tell' wouldn't apply because they are giving an assurance to us that they wouldn't refer for or provide abortion service to our client using contract funding."  Id. at ¶ 50.  Despite this answer, in April of 2006, HHS awarded the master contract to the USCCB.  Id. at ¶ 51.[6]  From April of 2006 to April of 2007, the USCCB was awarded $2.5 million.  Id. at ¶ 66.  From April of 2007 to April of 2008, it received more than $3.5 million.  Id.

The USCCB has enforced the "conscience exception" by incorporating language in its subcontractor agreements prohibiting NGOs from using TVPA funds for "referral for abortion services or contraceptive materials."  Id. at ¶ 57.  This restriction is also set out in the operations manual that the USCCB distributes to the provider NGOs.  The manual flatly states that "program funding cannot be used for abortion services or contraceptive materials.  Subcontractors will not be reimbursed for these services."  Id. at ¶¶ 58-59.[7]

---

materials were among the clinical services that victims of human trafficking might likely request.  In enacting the TVPA, Congress made the finding that female trafficking victims were often forced into prostitution and subjected to rape and other forms of sexual abuse, exposing them to sexually transmitted diseases, including HIV and AIDS, and inferentially, unwanted pregnancies.  See 22 U.S.C. § 7101(b)(6)-(11).

[6]The USCCB's contract has since been renewed annually and is eligible for renewal through 2011.  Id. at ¶ 64.

[7]The issue is not rendered moot by the so-called "Hyde Amendment," styled after Henry Hyde, Congressman from Illinois and a staunch opponent of abortion.  The Hyde

<u>DISCUSSION</u>

Defendants move to dismiss the ACLU's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  Specifically, defendants challenge the ACLU's claim to have standing to litigate the case.  Article III, § 2, of the Constitution limits federal courts to the adjudication of actual "Cases" or "Controversies."  "To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477 (1990).  "Standing differs, in theory, from all other elements of justiciability by focusing primarily 'on the *party* seeking to get his complaint before a federal court' and only secondarily 'on the *issues* he wishes to have adjudicated.'" Laurence H. Tribe, <u>American Constitutional Law</u> 385-386 (3d ed. 2000) (footnotes omitted) (emphases in original).

The burden of establishing standing rests with the party invoking the jurisdiction of the federal courts.  <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 167-168 (1997).

> [There are] three fundamental requisites of standing that every litigant invoking the jurisdiction of the federal courts must possess:  (1) injury-in-fact – an invasion of a legally-protected interest that is both concrete and particularized, and actual or imminent; (2) causation; and (3) redressability. Several prudential considerations also infuse standing determinations. These considerations, which militate against standing, principally concern whether the litigant (1) asserts the rights and interests of a third party and not his or her own, (2) presents a claim arguably falling outside the zone of

_____

Amendment is a rider (not a statute) which, if attached to an appropriations bill, bars the use of federal funds for abortions.  Congress has annually attached the Hyde Amendment to HHS's general appropriation causing its impact to be felt primarily by recipients of Medicaid funds.  The Amendment has also been used to deny abortion services to U.S. military personnel, federal prisoners, and Peace Corps Volunteers.  To the best of the court's knowledge, it has never been attached as a rider to the TVPA.

interests protected by the specific law invoked, or (3) advances abstract questions of wide public significance essentially amounting to generalized grievances more appropriately addressed to the representative branches.

Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101, 104 (1st Cir. 1995) (internal citations omitted).  See also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992) (same).

An association has standing to bring a lawsuit on behalf of its members "when [1] at least one of its members possesses standing to sue in his or her own right; [2] the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and [3] neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." Libertad v. Welch, 53 F.3d 428, 440 (1st Cir. 1995).  See also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).  The ACLU contends that it has associational standing by virtue of its members' status as federal taxpayers.[8]

Until 1968, the law was clear that a taxpayer could not claim standing to challenge the constitutionality of a federal statute based on the use of his or her tax dollars to implement an allegedly unconstitutional practice or program.

> The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the

---

[8]Defendants do not challenge the ACLU's claim to standing under the second and third elements of the test.

conclusion which we have reached, that a suit of this character cannot be maintained.

Frothingham v. Mellon, 262 U.S. 447, 487 (1923).  The Court backed away from this flat prohibition, however, in Flast v. Cohen, 392 U.S. 83 (1968).  In Flast, the Court entertained an Establishment Clause challenge to the expenditure of federal funds "to finance instruction in reading, arithmetic, and other subjects in religious schools, and to purchase textbooks and other instructional materials for use in such schools." Id. at 85-86.

The congressional act challenged in Flast set up a complicated mechanism under which local entities serving the educational needs of low income families submitted requests to state agencies for federal funds.  The applications were approved based on a set of criteria established by the United States Commissioner of Education that permitted distribution of public financial aid to religious schools.  Describing the Frothingham decision as "confus[ing]" and "critici[zed]," the Flast Court concluded that its holding was likely motivated by prudential concerns, and that there was "no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs." Id. at 92, 101.

The Court then fashioned a two-part test to be applied in determining whether a taxpayer had a stake in a controversy over the expenditure of public funds sufficient to confer standing.

First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked.  Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the

6

administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged.  Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8.  When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.

Id. at 102-103.

The Flast Court found that the plaintiff taxpayers had satisfied both prongs of the test.[9]  First, the Court found that the constitutional challenge was "made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare, and the challenged program involves a substantial expenditure of federal tax funds."  Id. at 103.  Second, the Court found that the plaintiffs had shown a constitutional nexus between their status as taxpayers and the constitutional harm by alleging "that the challenged expenditures violate the Establishment and Free Exercise Clauses of the First Amendment."  Id.

In its most recent taxpayer standing case, Hein v. Freedom From Religion Found., Inc., 551 U.S. 587 (2007), the Court cautioned that the Flast exception is "narrow" and must be applied with "rigor."  Id. at 602, 603 (plurality opinion) (citation omitted).  See also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 347 (2006) (declining to extend Flast to a taxpayer challenge to state investment tax credits alleged to discriminate against interstate

---

[9]Although one of the seven plaintiffs in Flast was identified as a parent of school-age children, taxpayer status appears to have been the only common denominator among the plaintiffs.  Id. at 85 n.1.

commerce).  It is worth noting that in applying the <u>Flast</u> exception, the Court has never permitted standing where the Spending Clause of Article I was not directly implicated.[10] <u>See</u> <u>Hein</u>, 551 U.S. at 610.  Nor has the Court ever allowed standing to challenge a violation under any constitutional provision other than the Establishment Clause.[11]  <u>Id</u>. at 609.

Defendants offer three reasons why they believe that the ACLU lacks standing under the <u>Flast</u> exception: (1) the TVPA does not itself mandate spending in violation of the Establishment Clause; (2) the TVPA is not based solely on Congress's exercise of its powers under the Spending Clause; and (3) the ACLU cannot show a "direct dollar-and-cents injury."  The court will address each of these arguments in turn.

<u>Statutory Mandate</u>

It cannot be disputed that the TVPA does not directly mandate HHS to spend taxpayer money in violation of the Establishment Clause.  The mechanism rather is more like the one created in <u>Flast</u>.  The TVPA simply directs HHS to provide social services to victims of human trafficking.  It does not order HHS to include religious organizations among the service providers (nor does it exclude them), nor does it specify the exact nature of the social services that are to be provided.  Instead, these matters are left to the discretion of the Secretary.  The TVPA does, however, make a specific annual

---

[10]"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const., Art. I, § 8, cl. 1.

[11]"Congress shall make no law respecting an establishment of religion . . . ."  U.S. Const., Amend. I.

appropriation (currently of "up to" $12.5 million) to carry out its victims' services mandate.

Supreme Court cases since <u>Flast</u> discussing taxpayer standing are admittedly confusing. They do, however, at least stake out the poles of the spectrum that divides what is authorized from what is not. At one pole is <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.</u>, 454 U.S. 464 (1982). In <u>Valley Forge</u>, the Court held that taxpayers did not have standing to challenge a decision by the Secretary of Health, Education, and Welfare (HEW) to give over a tract of surplus federal land to a Bible study college. <u>See id</u>. at 479. The Secretary based his decision on the authority bestowed by the Federal Property and Administrative Services Act of 1949. That Act authorized the Secretary to transfer surplus real property (in the <u>Valley Forge</u> case, land from a decommissioned military hospital) to nonprofit, tax-exempt educational institutions. <u>Id</u>. at 467.

In refusing standing to plaintiff taxpayers, the Court noted that "the source of their complaint is not a congressional action, but a decision by HEW to transfer a parcel of federal property." <u>Id</u>. at 479. Because the transfer did not involve an exercise of the congressional spending power under Article I, but rather one of executive authority under the Property Clause of Article IV, it did not in the Court's estimation fall within the <u>Flast</u> exception. <u>Id</u>. at 480. The Court found that the link between the property transfer and any burden on the taxpayers was "at best speculative and at worst non-existent" because the government had acquired the property some three decades before the lawsuit was brought. <u>Id</u>. at 480 n.17.

The other pole on the spectrum was planted six years later in <u>Bowen v. Kendrick</u>,

9

487 U.S. 589 (1988).  In Kendrick, taxpayers brought Establishment Clause challenges, both facial and "as-applied," to the Adolescent Family Life Act (AFLA), 42 U.S.C. § 300z, *et seq.*  The AFLA appropriated money to be disbursed by HHS to community service groups, including religiously affiliated groups, working to discourage premarital sex and teen pregnancy.  Kendrick, 487 U.S. at 593.  As the Court noted, "the AFLA expressly states that federally provided services in this area should promote the involvement of parents, and should emphasize the provision of support by other family members, religious and charitable organizations, voluntary associations, and other groups." Id. at 596 (citation omitted).[12]

The Court first rejected plaintiffs' facial challenge to AFLA, explaining that,

[a]s we see it, it is clear from the face of the statute that the AFLA was motivated primarily, if not entirely, by a legitimate secular purpose – the elimination or reduction of social and economic problems caused by teenage sexuality, pregnancy, and parenthood.  Appellees cannot, and do not, dispute that, on the whole, religious concerns were not the sole motivation behind the Act, nor can it be said that the AFLA lacks a legitimate secular purpose. . . . There is simply no evidence that Congress' actual purpose in passing the ALFA was one of endorsing religion.

Id. at 602-604 (internal citations and quotation marks omitted).

Turning to the "as-applied" challenge, the Court had little difficulty identifying a link

--------

[12]The AFLA findings stated that issues of adolescent premarital sex and pregnancy "are best approached through a variety of integrated and essential services provided to adolescents and their families" by groups including "religious and charitable organizations."  42 U.S.C. § 300z(a)(8)(B).  The AFLA further mandated that services provided by the federal government should "emphasize the provision of support by . . . religious and charitable organizations . . . ." Id. § 300z(a)(10)(C).  It also instructed that demonstration projects funded by the government "shall . . . make use of support systems such as . . . religious and charitable organizations . . . ." Id. § 300z-2(a).  Finally, the AFLA required demonstration project grant applicants to describe how they would "involve religious and charitable organizations."  Id. § 300z-5(a)(21)(B).

between plaintiffs' status as taxpayers and the underlying congressional appropriation,

even though the funds had ultimately been disbursed by the Secretary.

> We do not think . . . that [appellees'] claim that AFLA funds are being used improperly by individual grantees is any less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary . . . . [Since <u>Flast</u>], we have not questioned the standing of taxpayer plaintiffs to raise Establishment Clause challenges, even when their claims raised questions about the administratively made grants. . . . Nor is this, as we stated in <u>Flast</u>, a challenge to "an incidental expenditure of tax funds in the administration of an essentially regulatory statute." The AFLA is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate. In this litigation there is thus a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute.

<u>Id</u>. at 619-620 (internal citations omitted).

The Court, however, faulted the district court's approach for failing to identify more

specifically those grantees who in its view were "pervasively sectarian," and therefore

constitutionally suspect, although the Court agreed that from all appearances, some AFLA

funds had been used "for constitutionally improper purposes." <u>Id</u>. at 620. The Court

remanded the case to the district court with the instruction that if it definitively found "that

the Secretary has wrongfully approved certain AFLA grants, an appropriate remedy would

be to require the Secretary to withdraw such approval." <u>Id</u>. at 622.

That brings us, nineteen years later, to <u>Hein</u>. Plaintiffs in <u>Hein</u> objected to a 2001

Presidential Executive Order creating a White House Office of Faith-Based and

Community Initiatives (OFBCI). <u>See</u> 551 U.S. at 593. The purpose of the OFBCI as

explained in the Order was to ensure that "private and charitable community groups, including religious ones . . . have the fullest opportunity permitted by law to compete on a level playing field, so long as they achieve valid public purposes." Id. at 594, quoting Exec. Order No. 13199, 3 C.F.R. § 752 (2001 Comp.).[13]

Plaintiffs, an organization of atheists and agnostics and three of its taxpayer members, objected to the use of Executive Branch funds by the OFBCI to hold regional conferences explaining federal grant opportunities to which religious and secular groups were invited. At the conferences, federal officials extolled the value of religiously-oriented social services. The Hein Court, however, disagreed with plaintiffs' premise that the congressional spending power had been diverted to religious purposes, noting that "Congress [had only] provided general appropriations to the Executive Branch to fund its day-to-day activities. These appropriations did not expressly authorize, direct, or even mention the expenditures of which [taxpayers] complain. Those expenditures resulted from executive discretion, not congressional action." Id. at 605. The Court additionally noted that "[n]o congressional legislation specifically authorized the creation of the White House Office or the Executive Department Centers. Rather, they were 'created entirely within the executive branch . . . by Presidential executive order.' Nor has Congress enacted any law specifically appropriating money for these entities' activities. Instead, their activities are funded through general Executive Branch appropriations." Id. at 595 (internal citation omitted).

---

[13]As part of the initiative, the President issued four separate Executive Orders creating Executive Department Centers for Faith-Based and Community Initiatives within certain federal agencies and departments. Id. at 594 n.1.

In contrasting the general appropriation at issue in <u>Hein</u> with the specific appropriation of funds in <u>Flast</u>, the Court plurality, in an opinion authored by Justice Alito, found that

> [t]he link between congressional action and constitutional violation that supported taxpayer standing in <u>Flast</u> is missing here. Respondents do not challenge any specific congressional action or appropriation; nor do they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue here were not made pursuant to any Act of Congress.

<u>Id.</u> at 605. The Court plurality concluded that <u>Flast</u> had turned on a finding of congressional action, and declined to extend its holding to "purely executive expenditures" from discretionary funds appropriated for administrative expenses.[14] <u>Hein</u>, 551 U.S. at 610. In summary, the plurality stated that while "[w]e do not extend <u>Flast</u>, . . . we also do not overrule it. We leave <u>Flast</u> as we found it." <u>Id.</u> at 615.

Justice Alito then turned to <u>Kendrick</u>, redoubling the focus on the distinction between general Executive Branch appropriations and the AFLA's designated appropriations.

> [K]ey to [the finding that a sufficient nexus existed in <u>Kendrick</u>] was the Court's recognition that AFLA was "at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers," and that the plaintiffs' claims "call[ed] into question how the funds authorized by

---

[14]The executive-legislative distinction propounded by Justice Alito attracted the support of only Chief Justice Roberts and Justice Kennedy. The two concurring Justices (Scalia and Thomas) would have overruled <u>Flast</u> altogether. Justice Scalia was particularly scathing in his rejection of the source-of-funds distinction Justice Alito had attempted to draw. Justice Souter wrote for the dissent, also arguing that the distinction between congressionally-mandated spending and executive discretion was arbitrary and unmanageable. It is a matter of some interest that the government in its brief to the Court in <u>Hein</u> argued for limiting taxpayer standing to objections to expenditures of public funds by non-governmental third parties (such as the USCCB).

Congress [were] being disbursed *pursuant to the AFLA's statutory mandate*."

Id. at 607 (emphasis in original) (citation omitted).  In rejecting respondents' "attempt to paint their lawsuit as a <u>Kendrick</u>-style as-applied challenge," the Court stated that the

> effort is unavailing for the simple reason that they can cite no statute whose application they challenge.  The best they can do is to point to unspecified, lump-sum "Congressional budget appropriations" for the general use of the Executive Branch – the allocation of which "is a[n] administrative decision traditionally regarded as committed to agency discretion."  Characterizing this case as an "as-applied challenge" to these general appropriation statutes would stretch the meaning of that term past its breaking point.

Id. at 607-608 (internal citation omitted).

This much at least seems clear.  <u>Hein</u> "precludes standing when a taxpayer challenges a statute generally providing funding to the executive branch."  <u>Murray v. Geithner</u>, 2010 WL 431730, at *2 (E.D. Mich. Feb. 2, 2010).  It would also seem that <u>Flast</u> and <u>Kendrick</u> remain (at least for now) the controlling law on taxpayer standing when the expenditure being challenged is not a "lump-sum 'Congressional budget appropriation[]' for the general use of the Executive Branch."  <u>Hein</u>, 551 U.S. at 607.  Navigating between these poles, the TVPA expenditures at issue here appear more like the funds disbursed under the AFLA than those spent to support the activities of the OFBCI.  The TVPA, like the AFLA, designated a group of intended beneficiaries – in the case of the TVPA, victims of human trafficking abuse, in the case of the AFLA, sexually active adolescents – and like the AFLA, the TVPA required the funding of services for the group.[15]

---

[15]The court is aware of at least one post-<u>Hein</u> decision that denied taxpayer standing in an apparent contradiction of this analysis.  <u>See</u> <u>Freedom From Religion Found., Inc. v. Nicholson</u>, 536 F.3d 730 (7th Cir. 2008).  In <u>Nicholson</u>, a public interest group brought an action challenging the Department of Veterans Affairs' integration of faith and spirituality into health care services offered to veterans.  The Seventh Circuit denied

Defendants' argument that for taxpayer standing to attach under <u>Hein</u>, the challenged appropriation must directly mandate the turnover of funds to religious organizations is not supported by the text of the <u>Hein</u> plurality decision. In commenting on <u>Flast</u>, Justice Alito observed that "[a]t around the time the [AFLA] was passed and [<u>Flast</u>] was decided, the great majority of nonpublic elementary and secondary schools in the United States were associated with a church. . . . Congress surely understood that much of the aid mandated by the statute would find its way to religious schools."[16] <u>Hein</u>, 551 U.S. at 604 n.3. As Judge Zatkoff observed in <u>Murray</u>, "a requirement of religious contemplation in the challenged statute would eviscerate as-applied challenges under the Establishment Clause, which have expressly been permitted since <u>Kendrick</u>." <u>Murray</u>,

---

taxpayer standing, holding that the lawsuit was "not predicated, as <u>Hein</u> requires, on the notion that *Congress* appropriated money from federal taxpayers expressly for the creation of a clinical chaplaincy. Instead, [plaintiffs simply are] challenging the executive branch's approach to veterans' healthcare and the manner in which the executive, in its discretion, uses the services of its chaplain personnel." <u>Id.</u> at 742 (emphasis in original). To the extent that Judge Ripple's opinion may be read to interpret <u>Hein</u> to deny standing whenever an executive agency exercises its discretion over expenditures, this court disagrees. What Justice Alito's plurality opinion requires for taxpayer standing is an expenditure made "pursuant to an[] Act of Congress," <u>Hein</u>, 551 U.S. at 605, as opposed to a "general appropriation statute[]." <u>Id.</u> at 608. As Justice Scalia noted in his concurring opinion in <u>Hein</u>, "[t]he whole point of the as-applied challenge in <u>Kendrick</u> was that the Secretary, not Congress, had *chosen* inappropriate grant recipients. Both <u>Kendrick</u> and [<u>Hein</u>] equally involve, in the relevant sense, attacks on executive discretion rather than congressional decision: Congress generally authorized the spending of tax funds for certain purposes but did not explicitly mandate that they be spent in the *unconstitutional* manner challenged by the taxpayers." <u>Id.</u> at 630-631 (Scalia, J., concurring) (emphases in original). Significantly, Justice Scalia felt that the plurality opinion in <u>Hein</u> "flatly contradicts <u>Kendrick</u>." <u>Id.</u> at 630.

[16]In <u>Flast</u>, Congress did not expressly state that religious organizations would be eligible grantees of the funds appropriated to support elementary and secondary education, rather it provided funding for "private" schools. 392 U.S. at 86-87.

2010 WL 431730, at *3.  See also Am. Civil Liberties Union of Minn. v. Tarek Ibn Ziyad Acad., 2009 WL 2215072, at *6 (D. Minn. July 21, 2009) ("To the extent that Defendants suggest that a statute must mention religion on its face, the Court disagrees.  Funding under a legislative enactment that does not specifically mention religion is not necessarily a general appropriation.  Hein did not overrule Flast or Kendrick.").[17]

The issue is by no means open and shut, but the court is of the view that the ACLU has met its burden under Flast of showing a link between the congressional power to tax and spend and a possible violation of the Establishment Clause in the grant of public funds to the USCCB.  As with the AFLA, the TVPA "is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and [plaintiff's] claims call into question how the funds authorized by Congress are being disbursed pursuant to the . . . statutory mandate. . . . [T]here is thus a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the [discretionary] role the Secretary plays in administering the statute." Kendrick, 487 U.S. at 620.

Sole Exercise of the Spending Power

Defendants next argue that taxpayer standing does not attach because in enacting the TVPA, Congress invoked two of its powers that are independent of the Spending Clause – the Commerce Clause, Article I, § 8,[18] and the Enabling Clause of the Thirteenth

---

[17]Although Ibn Ziyad involved a constitutional challenge to a state religious aid statute, Judge Frank's analysis is apt in a federal context as well.

[18]"[The Congress shall have power] to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." U.S. Const., Art. 1, § 8, cl. 3.

Amendment (prohibiting involuntary servitude). As defendants note, in enacting the TVPA, Congress made findings that "[t]rafficking in persons substantially affects interstate and foreign commerce," 22 U.S.C. § 7101(b)(12), and that "[t]he right to be free from slavery and involuntary servitude is among [a person's] inalienable rights." Id. § 7101(b)(22). However, the power of Congress to appropriate funds is entirely a function of the Spending Clause – whatever might be the additional grants of legislative authority granted to Congress by the Constitution.

Defendants nonetheless argue that for taxpayer standing to attach under Flast, Congress must have enacted the challenged legislation relying *solely* on the Spending Clause. That is, even if an exercise of the Spending Clause is a necessary predicate of a statute, standing does not exist when Congress in enacting legislation relies on additional provisions of the Constitution. Defendants point to the following sentence in Flast: " [A] taxpayer will be a proper party to allege the unconstitutionality *only* of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." Flast, 392 U.S. at 102 (emphasis added).

"Only" is a flexible qualifier, the placement of which can dramatically alter the meaning of even a simple sentence.[19] Here, sensibly interpreted, the qualifier "only" in Flast is meant to delimit taxpayer standing to circumstances in which an exercise by Congress of its power under the Spending Clause can be affirmatively linked to a violation of the Establishment Clause, as opposed to congressional acts that are strictly regulatory

---

[19]Take, for example, "only he loves his wife," "he only loves his wife," and "he loves his only wife."

in nature.  Defendants place too much weight on the word "only" as it is used in the Flast

sentence in reading it to eliminate standing when Congress cites powers in addition to the

Spending Clause in making an appropriation.  The reasoning of the district court in Katcoff

v. Marsh, 582 F. Supp. 463, 471 (E.D.N.Y. 1984) (citations omitted) (emphasis in original),

overruled on other grounds, 755 F.2d 223, 231 (2d Cir. 1985), is persuasive:

> Because there is no litmus test to determine which power Congress
> exercises in enacting a given statute, some writers have suggested that it is
> wiser to regard "all government spending [as] an exercise of the
> congressional power to tax and spend."  This view finds some support in
> Flast, where the Court repeatedly emphasized that taxpayer standing was
> designed to allow federal taxpayers to challenge "a specific expenditure of
> federal funds."   In limiting the scope of taxpayer standing, the Court's
> concern was to block challenges to "essentially regulatory statute[s]." It may
> be fairly inferred that the fact of Congressional spending – rather than the
> nominal source of that spending – was the Court's central concern.

See also Newdow v. Eagen, 309 F. Supp. 2d 29, 39 (D.D.C. 2004) (finding taxpayer

standing to bring an Establishment Clause challenge to a federal statute authorizing funds

to employ Senate and House chaplains where the statute was "at least in part an exercise

of Congress's authority under the taxing and spending clause of U.S. Const. art. I, § 8.").

A case relied upon by defendants in this regard, Winkler v. Gates, 481 F.3d 977

(7th Cir. 2007), is readily distinguishable.  In Winkler, the Seventh Circuit considered an

Establishment Clause challenge to a congressional statute directing the United States

Military to assist the Boy Scouts of America in staging its quadrennial "Jamboree."  Id. at

979.[20]  The Court of Appeals framed the issue as "whether the Jamboree statute is more

---

[20]The Jamoboree is a national Boy Scout event.   The Boy Scouts condition
membership on a Scout's belief in God.   Id. at 979.  The statute at issue in Winkler
required the military to assist the Jamboree by lending equipment such as cots, blankets,
and medical supplies, and by providing transportation to individual Boy Scouts.  See id.

like the surplus property act in <u>Valley Forge</u> or more like the AFLA program in [<u>Kendrick</u>]."
<u>Id</u>. at 982.   The Court held that the statute was "not a 'taxing and spending' statute but
rather is authorized by Congress's powers under the Property Clause, Art. IV, § 3, cl. 2,
and the Military Clauses, Art. I, § 8, cls. 12-14.   The military is, in other words, just
regulating its own property and manpower."   <u>Id</u>. at 985-986.   Finally, the Court noted that
while some "incidental spending" might be involved, the statute was not the "kind of 'taxing
and spending' legislation identified in <u>Flast</u> as suitable for a taxpayer challenge."   <u>Id</u>. at
988.[21]

<u>Affirmative Spending</u>

Defendants' final argument is that the Complaint does not allege that any taxpayer
monies have been spent to support religious activities.   As defendants see it, the ACLU
objects not to the services being provided through the USCCB, but to the fact that certain
other services are *not* provided – namely, contraceptive materials and abortions.
Defendants refer to the Supreme Court's pre-<u>Flast</u> ruling denying standing to taxpayers

---

at 982, citing 10 U.S.C. § 2554.

[21]In another case cited by defendants, <u>Ams. United for Separation of Church and
State v. Reagan</u>, 786 F.2d 194 (3d Cir. 1986), the Third Circuit rejected taxpayer standing
to challenge legislation authorizing diplomatic recognition and the dispatch of a legation
to the Vatican.   The Court ruled that "[t]he repeal of the 1867 prohibition against
maintaining a mission in Rome is not a spending enactment."   <u>Id</u>. at 199.   Despite dicta
suggesting that the <u>Flast</u> limitation should be read as defendants do, the case turned on
the fact that "[l]egal challenges to the establishment of diplomatic relations require the
review of one of the rare governmental decisions that the Constitution commits exclusively
to the Executive Branch."   <u>Id</u>. at 202.

challenging a New Jersey statute requiring that public schools open the school day with the reading of five verses from the Old Testament.  See Doremus v. Bd. of Educ. of Borough of Hawthorne, 342 U.S. 429 (1952).  In Doremus, the Court ruled that the grievance at issue "is not a direct dollars-and-cents injury but it is a religious difference." Id. at 434.  In that case, it was crucial to the Court's determination that there was "no allegation that this activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school."  Id. at 433.  In contrast, here, the ACLU alleges that pursuant to the TVPA, tax dollars are being paid to the USCCB to support the propagation of its religious beliefs.

If defendants are right – that this is a case not about the Establishment Clause, but about the issue of abortion – and not as the ACLU insists, about an alleged unconstitutional act by Congress, namely, the delegation of Congress's spending power to a religious organization to enforce its doctrinal views, then defendants have a perhaps dispositive point.[22]  It is simply too early in the litigation, however, to make that determination.[23]  For present purposes, the court concludes no more than that the ACLU has established that it has standing to proceed.

---

[22]At the hearing, the court asked Ms. Amiri, the counsel for the ACLU, whether this lawsuit would have been brought if "Congress had insisted the money be given to religious organizations that as a matter of faith believed in promoting abortion rights."  Hr'g Tr. at 24.  She replied, "Yes, your Honor, I think to the extent that there is any sort of furthering of religion with taxpayer dollars, that rises to the level of an Establishment Clause claim, regardless of what the specific contours are, and it also means that taxpayers have standing to bring that case."  Id. at 25.

[23]Both sides agree that this case does not in any way impugn the efforts undertaken by the USCCB to provide valuable and needed services to human trafficking victims.

In closing, I do not pretend that <u>Hein</u> offers clear direction to lower courts as to how to draw the line between just enough congressional involvement to confer taxpayer standing and too little so as to deny it.  I further recognize that the distinction between congressional and executive spending propounded in <u>Hein</u> may be unrealistic given the complexities of modern interactions between Congress and the Executive Branch.  I have no present allegiance to either side of the debate, only a firm conviction that the Establishment Clause is a vital part of the constitutional arrangement envisioned by the Framers, and perhaps a reason we have not been as riven by sectarian disputes as have many other societies.  I also agree that a rule that has no enforcement mechanism is not a rule at all.  Taxpayer standing may not be the best or the most desirable or even a necessary means of enforcing the separation of church and state, but unless the Supreme Court decrees differently, it is one of the principal tools available.  The uncertainty of the scope of taxpayer standing necessarily invites decisions lacking in consistency.  I have no doubt that many of my colleagues would (and will) in all good faith draw the line differently than have I.  But until the Supreme Court gives definitive guidance, judges will have to decide using their best understanding of the law as it exists.  That is what I have attempted to do here.

ORDER

For the foregoing reasons, defendants' motion to dismiss will be <u>DENIED</u>.  Within fourteen (14) days from the date of this Order, the parties will file a joint proposed order defining the scope and scheduling of any necessary discovery.

SO ORDERED.

21

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE