UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10038-RGS

AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS

v.

KATHLEEN SEBELIUS, et al.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT AND
DEFENDANT-INTERVENOR'S MOTION TO DISMISS

March 23, 2012

STEARNS, D.J.

In this case, plaintiff American Civil Liberties Union of Massachusetts (ACLU) claims that officials of the U.S. Department of Health and Human Services (HHS) violated the Establishment Clause of the First Amendment by allowing the United States Conference of Catholic Bishops (USCCB) to impose a religiously based restriction on the disbursement of taxpayer-funded services. Presently before the court are the parties' cross-motions for summary judgment, as well as defendant-intervenor USCCB's motion to dismiss for lack of subject matter jurisdiction. The court heard oral argument on October 18, 2011.

BACKGROUND

The undisputed facts are as follows. In 2000, Congress passed the Trafficking

Victims Protection Act (TVPA). *See* 22 U.S.C. §§ 7101-7112.[1] The purposes of the TVPA are "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id*. § 7101(a). The TVPA includes a provision directing the Secretary of HHS and other federal government officials to "expand benefits and services to victims of severe forms of trafficking in persons in the United States . . . ." *Id*. § 7105(b)(1)(B). Congress appropriated "up to" $5 million "to carry out the TVPA" in fiscal year 2001, and "up to" approximately $10 million for each of the subsequent fiscal years. Gov. Defs.' Statement of Facts (SOF) ¶ 5.

HHS initially implemented the victims' services mandate by making grants to nonprofit organizations that worked directly with trafficking victims. In November of 2005, HHS decided to select a general contractor to administer the funds. To this end, HHS published a Request For Proposals (RFP). In response, HHS received timely proposals from two organizations: the USCCB ("a religious organization whose

_____

[1] The TVPA was reauthorized in 2003, 2005, and 2008. *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558; William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.

membership consists of the Catholic bishops in the United States")[2] and the Salvation Army ("an evangelical part of the universal Christian Church" engaged in various charitable enterprises).[3]  In its proposal, the USCCB included the following cautionary note:

> *as we are a Catholic organization*, we need to ensure that our victim services are not used to refer or fund activities that would be contrary to our moral convictions and religious beliefs.  Therefore, we would explain to potential subcontractors our disclaimer of the parameters within which we can work. Specifically, subcontractors could not  provide or refer for abortion services or contraceptive materials for our clients pursuant to this contract.

Gov. Defs.' SOF ¶ 28 (emphasis added).[4]

To evaluate the two proposals, HHS appointed a four-member "technical evaluation panel."  Gov. Defs.' SOF ¶ 32.  On the initial evaluation, two of the panel members raised concerns about the USCCB's stated intent to prohibit subcontractors

---

[2] Pl.'s SOF  ¶ 27; USCCB's Resp. to Pl.'s SOF ¶ 27.

[3]  *About:  Mission  Statement*,  The  Salvation  Army, http://www.salvationarmyusa.org/usn/www_usn_2.nsf/vw-local/About-us (last visited Mar. 23, 2012).

[4] This frank statement that the abortion/contraception restriction was motivated by Catholic dogma is at odds with the argument advanced by the government defendants that "[t]he funding restrictions at issue here simply represent a coincidental overlap between legitimate governmental objectives and religious tenets."  Gov. Defs.' Mem. at 10.

from offering or subsidizing abortion services and contraceptives.[5]   The panel

members' reservations were conveyed to the USCCB in the form of written questions.

Among the questions, the USCCB was asked: "Would a 'don't ask, don't tell' policy

work regarding the exception?  What if a subcontractor referred victims supported by

stipend to a third-party agency for such services?"  Gov. Defs.' SOF ¶ 43.  The

USCCB responded:

> [w]e can not be associated with an agency that performs abortions or
> offers contraceptives to our clients.  If they sign the written [subcontract]
> agreement, the "don't ask, don't tell" wouldn't apply because they are
> giving an assurance to us that they wouldn't refer for or provide abortion
> service to our client using contract funding.  The subcontractor will know
> in advance that we would not reimburse for those services.

*Id.* ¶ 52.

   After receiving the answers, HHS reopened the RFP process to permit the

USCCB and the Salvation Army to submit revised technical proposals, which both

---

[5] In enacting the TVPA, Congress made a finding that female trafficking victims
are often forced into prostitution and subjected to rape and other forms of sexual abuse.
*See* 22 U.S.C. § 7101(b)(6).  The TVPA specifies that trafficking victims "shall be
eligible for benefits and services under any Federal or State program or activity funded
or administered by any official or agency . . . to the same extent as" refugees.  *Id.* §
7105(b)(1)(A).  "Medicaid and Refugee Medical Assistance pay for contraception and
abortions in the case of rape, incest, and when the woman's life is in danger."  Pl.'s
SOF ¶ 59; USCCB's Resp. to Pl.'s SOF ¶ 59.  The RFP made no reference to
restrictions on the use of TVPA funds for contraception or abortion services.   The
USCCB apparently raised the issue on the understanding that abortions and
contraceptives are among the clinical services that victims of human trafficking might
request.

organizations did.[6]  On April 11, 2006, HHS awarded the master contract to the USCCB.  The contract incorporated by reference the USCCB's Technical Proposal and Amended Technical Proposal, including the abortion and contraception restriction.  Gov. Defs.' SOF ¶ 75.  Pursuant to the award, the USCCB entered into subcontracts with over 100 service providers, many of which are not Catholic institutions.  The subcontract included the restriction that "funds shall not be used to provide referral for abortion services or contraceptive materials, pursuant to this contract."  Pl.'s SOF ¶ 62; USCCB's Resp. to Pl.'s SOF ¶ 62.  The abortion/contraception restriction was also contained in the program operations manual that the USCCB distributed to its subcontracters.  Pl.'s SOF ¶ 63; USCCB's Resp. to Pl.'s SOF ¶ 63.  Subcontractors were further required to ensure that no staff time paid through the USCCB contract was used in providing referrals for abortions or contraceptive materials.  Pl.'s SOF ¶ 64; USCCB's Resp. to Pl.'s SOF ¶ 64.

The original HHS-USCCB contract had a term of one year, with options for four annual renewals.  HHS exercised each of these options, renewing the contract for a five-year duration.  During the first four years of the contract, the government defendants awarded the USCCB over $13 million.  As of June of 2010, the government

_____

[6] The USCCB's Amended Technical Proposal included the same prohibition on the use of contract funds to pay for abortion services and contraceptive materials.  Pl.'s SOF ¶ 46; USCCB's Resp. to Pl.'s SOF ¶ 46.

defendants awarded the USCCB an additional $2.9 million.[7] Pl.'s SOF ¶ 79; USCCB's Resp. to Pl.'s SOF ¶ 79. Before the contract was set to expire (on April 10, 2011), HHS approved a six-month extension by way of a "Task Order." The Task Order expired on October 10, 2011. While HHS no longer has the authority to obligate additional funds under the original master contract or the Task Order, it can continue to pay the USCCB for "services provided within the period of performance of the Task Order." Timmerman Decl. ¶¶ 6-11.

On January 12, 2009, the ACLU brought this lawsuit against HHS officials,[8] alleging that they "have violated and continue to violate the Establishment Clause of the First Amendment by permitting [the] USCCB to impose a religiously based restriction on the use of taxpayer funds." Compl. ¶ 71. On May 15, 2009, defendants filed a motion to dismiss the Complaint for lack of standing. This court denied the motion on March 22, 2010. In June of 2010, the USCCB intervened in the lawsuit as permitted by Rule 24 of the Federal Rules of Civil Procedure. All three parties now move for summary judgment.

---

[7] Of this $15.9 million, the USCCB allocated over $5.3 million to pay for its administrative services and expenses. Pl.'s SOF ¶ 79; USCCB's Resp. to Pl.'s SOF ¶ 79.

[8] The Complaint originally named Michael O. Leavitt, the former Secretary of HHS. Leavitt's successor, Kathleen Sebelius, has since been substituted as a defendant in Leavitt's place.

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).

## I. Threshold Issues: Standing and Mootness

### A. Standing

Defendants previously challenged the ACLU's claim to have standing to litigate this case. In a Memorandum and Order dated March 22, 2010, the court found a sufficient showing of taxpayer standing on the part of the ACLU under existing Supreme Court doctrine. In reaching this conclusion, I reasoned that the ACLU had met its prima facie burden under *Flast v. Cohen*, 392 U.S. 83 (1968), which is to show "a logical link" between the plaintiff's taxpayer status and "the type of legislative enactment attacked," as well as "a nexus" between such taxpayer status and "the precise nature of the constitutional infringement alleged." *Id*. at 102.[9]

---

[9] I further reasoned that, for purposes of standing, "the TVPA expenditures at issue here appear more like the funds disbursed under the AFLA [the Adolescent

The government defendants and the USCCB now seek to revisit the issue of standing. The government defendants contend that "due to the further development of taxpayer standing principles in *Arizona Christian School Tuition Organization v. Winn*, 131 S. Ct. 1436 (2011), it is now clear that plaintiff lacks taxpayer standing in this case." Gov. Defs.' Reply at 6.[10] In *Winn*, the Supreme Court held that the taxpayer plaintiffs lacked standing to mount an Establishment Clause challenge to a dollar-for-dollar tax credit (up to $500) matched against contributions to scholarship funds

---

Family Life Act, at issue in *Bowen v. Kendrick*, 487 U.S. 589 (1988)] than those spent to support the activities of the OFBCI [the White House Office of Faith-Based and Community Initiatives, at issue in *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587 (2007)]. The TVPA, like the AFLA, designated a group of intended beneficiaries – in the case of the TVPA, victims of human trafficking abuse, in the case of the AFLA, sexually active adolescents – and like the AFLA, the TVPA required the funding of services for the group." Mar. 22, 2010 Mem. & Order at 14.

[10] The USCCB offers the additional argument that "[s]ince [the] ACLU challenges only the failure to use appropriated funds to pay for abortion and contraception services, the interests of [the] ACLU's members as taxpayers will not support standing in this case." USCCB's Mem. in Support of its Mot. to Dismiss at 8. I question whether this framing of the case accurately characterizes the position taken by counsel for the ACLU, that the focus of the lawsuit is not on the defense of a right of access to abortion services, but instead on an objection to the use of taxpayer dollars to enforce a religiously based restriction on access to such services. At a hearing on December 3, 2009, I asked ACLU counsel directly whether this lawsuit would have been brought "if Congress had insisted the money be given to religious organizations that as a matter of faith believed in promoting abortion rights." Dec. 3, 2009 Hr'g Tr. at 24. She replied, "Yes, your Honor, I think to the extent that there is any sort of furthering of religion with taxpayer dollars, that rises to the level of an Establishment Clause claim, regardless of what the specific contours are, and it also means that taxpayers have standing to bring that case." *Id*. at 25.

supporting students attending private schools, many of which are religiously based.  In

reaching its holding, the Court incorporated an "extracted and spent" element into the

taxpayer standing analysis.  It explicitly distinguished challenges to tax credits from

challenges to governmental expenditures, stating that "tax credits and governmental

expenditures do not both implicate individual taxpayers in sectarian activities.  A

dissenter whose tax dollars are 'extracted and spent' knows that he has in some small

measure been made to contribute to an establishment in violation of conscience."

*Winn*, 131 S. Ct. at 1447, quoting *Flast*, 392 U.S. at 106.  The Court further reasoned

that in contrast to a governmental expenditure, "awarding some citizens a tax credit

allows other citizens to retain control over their own funds in accordance with their

own consciences."  *Winn*, 131 S. Ct. at 1447.[11]

---

[11] Justice Scalia, joined by Justice Thomas, concurred.  He stated that he "would repudiate" *Flast*, as it is "an anomaly in our jurisprudence, irreconcilable with the Article III restrictions on federal judicial power that our opinions have established." *Id*. at 1450 (Scalia, J., dissenting).  Nevertheless, he joined the majority opinion "because it finds respondents lack standing by applying *Flast* rather than distinguishing it away on unprincipled grounds."  *Id*.

Justice Kagan, joined by Justice Ginsburg, Justice Breyer, and Justice Sotomayor, dissented.  She noted that the majority opinion's "novel distinction in standing law between appropriations and tax expenditures has as little basis in principle as it has in our precedent."  *Id*. at 1450 (Kagan, J., dissenting).  She reasoned that "[c]ash grants and targeted tax breaks are means of accomplishing the same government objective – to provide financial support to select individuals or organizations."  *Id*.  Thus, "[t]axpayers experience the same injury for standing purposes whether government subsidization of religion takes the form of a cash grant

Here, taxpayer members of the ACLU seek to challenge a governmental expenditure – the disbursement to the USCCB of funds appropriated by Congress under the TVPA. In contrast to *Winn*, this case does not involve any form of tax credit that allows plaintiffs and other dissenting citizens "to retain control over their own funds in accordance with their own consciences." *Id*. at 1447 (majority opinion).[12] Thus, the holding of *Winn* does not impeach this court's pre-*Winn* holding that the ACLU has standing to proceed.[13]

## B. Mootness

The government defendants next argue that this case is moot in light of the

---

or a tax measure." *Id*. at 1452.

[12] *See also id*. at 1448 ("[W]hat matters under *Flast* is whether sectarian [organizations] receive government funds drawn from general tax revenues, so that moneys have been extracted from a citizen and handed to a religious institution in violation of the citizen's conscience."). Here, a sectarian organization (the USCCB) has received government funds drawn from general tax revenues, implicating "*Flast*'s narrow exception to the general rule against taxpayer standing." *Winn*, 131 S. Ct. at 1440.

[13] It may be the case, as a prominent law journal suggests, that the Supreme Court will further restrict taxpayer standing in Establishment Clause cases at the next opportunity, or abolish it altogether (as Justice Scalia advocates). *See The Supreme Court, 2010 Term – Leading Cases*, 125 Harv. L. Rev. 172, 181-182 (2011). This court, however, does not have the freedom to blaze predictive trails. In the absence of any clear direction from higher authority, it must apply the law as the Supreme Court presently declares it to be.

expiration of the HHS-USCCB contract on October 10, 2011.[14]  Both the ACLU and

the USCCB disagree with this contention.  "The doctrine of mootness enforces the

mandate 'that an actual controversy must be extant at all stages of the review, not

merely at the time the complaint is filed.'"  *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60

(1st Cir. 2003), quoting *Steffel v. Thompson*, 415 U.S. 452, 460 n.10 (1974).  A case

is moot when a court cannot give "'any effectual relief whatever'" to the potentially

prevailing party.  *Church of Scientology of California v. United States*, 506 U.S. 9, 12

(1992), quoting *Mills v. Green*, 159 U.S. 651, 653 (1895).  The distinction between

standing and mootness is not always easily grasped.  "The confusion is understandable,

given [the Supreme Court's] repeated statements that the doctrine of mootness can be

described as the doctrine of standing set in a time frame:  The requisite personal interest

that must exist at the commencement of the litigation (standing) must continue

throughout its existence (mootness)."  *Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted).  *See*

---

[14] Although the HHS-USCCB contract and Task Order have expired, HHS is authorized to pay the USCCB for activities performed under the Task Order with federal taxpayer funds.  *See* Timmerman Decl. ¶ 11 ("USCCB may submit invoices for services provided within the period of performance for the Task Order.  On the basis of those invoices, HHS can pay for services rendered with the funds obligated under the Task Order.").  At the hearing on October 18, 2011, counsel for the government defendants confirmed that "USCCB may still submit further invoices or have certain intellectual property transferred back to the federal government . . . ."  Oct. 18, 2011 Hr'g Tr. at 24.

*also Becker v. Fed. Election Comm'n*, 230 F.3d 381, 387 n.3 (1st Cir. 2000) ("[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter.").

"The burden of establishing mootness rests squarely on the party raising it, and '[t]he burden is a heavy one.'" *Mangual*, 317 F.3d at 60, quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). "Mere voluntary cessation of allegedly illegal conduct does not moot a case . . . . A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n.*, 393 U.S. 199, 203 (1968). *See also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); *Conservation Law Found. v. Evans*, 360 F.3d 21, 26-27 (1st Cir. 2004) (noting that the government defendant's "voluntary cessation of the challenged conduct does not render the challenge moot" where the government defendant has not shown that the challenged action "will not recur.").

Here, the government defendants have failed to meet their "heavy" burden of demonstrating that it is "absolutely clear" that the circumstances giving rise to this case

will not recur.  Indeed, the USCCB states that it

> will continue to seek opportunities to collaborate with the government to provide [social] services if, but only if, it can do so without violating its moral and religious obligations not to facilitate the provision of abortion and contraception.  The government's filings give no indication that HHS has decided to reject such conscience protections in future contract and grant applications under the TVPA, and, even if such a decision were made, policies (and administrations) can change.  Moreover, although the particular case management contract involved in this litigation has expired, [the] USCCB currently has under other programs similar arrangements with HHS that contain the same exclusion of abortion and contraception purposes.[15]

USCCB's Supplemental Mem. at 4.  There is simply no "absolute" assurance that the

challenged action will not be repeated.  Only two bidders (the USCCB and the

Salvation Army) qualified for the original TVPA contract, which strongly suggests that

the USCCB (or another faith-based organization with similar tenets) will be among the

small number of qualified candidates vying for future TVPA contracts.[16]  As the ACLU

---

[15] "For example, HHS's Office of Refugee Resettlement administers a federal grant program to provide long-term foster care placements, transitional foster care services and related follow up services to unaccompanied undocumented children who have been apprehended and are in federal custody.  USCCB has recently received grants under this program under terms that accept that USCCB will not participate in funding abortion or contraception services. USCCB's Migration and Refugee Services operation participates in several other similar programs. *See* http://nccbuscc.org/mrs/funding-sources.shtml.  In all of them, USCCB has insisted on a conscience provision that stipulates that USCCB will not provide or fund abortion or contraception services."  USCCB's Supplemental Mem. at 4 & n.1.

[16] Congress has not indicated that it will not continue funding the TVPA.

notes, the USCCB

> has a long history of being awarded numerous government contracts. In
> fiscal year 2009 alone, for example, [the] USCCB received over $29
> million in federal grants and contracts. And [the] USCCB has admitted
> that in all subcontract agreements – with both Catholic and non-Catholic
> entities – it imposes the same restriction on the use of abortion and
> contraceptive referrals and services. . . . Thus, ACLU members who
> object to their tax dollars being used to promote religion are likely to be
> subjected to the same injury again.

Pl.'s Opp'n at 11-12; *see also* Gov. Defs.' Resp. to Pl.'s SOF ¶ 77.[17]

There is a second reason why the case is not moot: the ACLU is seeking, among

other forms of relief, a declaratory judgment. *See* Compl. at 12. "The fact that there

is no present ongoing dispute . . . does not, of course, mean the case is moot. . . . '[A]

---

[17] The government defendants argue that the voluntary cessation exception to the mootness doctrine does not apply because "HHS did not voluntarily terminate the contract;" rather, "[t]he contract expired due to the operation of law – HHS had no further options to renew the contract or extend the life of task orders under the contract." Gov. Defs.' Opp'n to USCCB's Supplemental Mem. at 6. While this is true, HHS could have awarded the new TVPA contract to the USCCB. It chose instead to divide the TVPA funds among three other organizations. *See* USCCB's Supplemental Mem. at 5-6. The record does not disclose whether the USCCB's abortion/contraception restriction was a determinative factor in HHS's decision not to award a new contract to the USCCB. The decision may well have been a political one that a successor administration with a different view of the issue could easily reverse. In any event, one effect of awarding the TVPA grants to other organizations is that HHS has (at least for the time being) voluntarily ceased its challenged endorsement of the USCCB's religiously motivated abortion/contraceptives restriction. However, the USCCB has emphatically stated that it "is not going away and . . . it is very likely to seek funding in the future under terms that include the conscience protections concerning abortion and contraception services that ACLU has challenged in this case." *Id*. at 6.

federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunctions.'" *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers*, 651 F.3d 176, 187, 189 (1st Cir. 2011), quoting *Zwickler v. Koota*, 389 U.S. 241, 254 (1967).[18]

## II.  The Establishment Clause Challenge

Turning to the merits, the ACLU argues that "by authorizing [the] USCCB to impose a religiously based prohibition on the use of TVPA funds, Defendants impermissibly endorsed and advanced religious beliefs, and fostered an excessive entanglement with religion, in violation of the Establishment Clause of the First Amendment to the U.S. Constitution." Pl.'s Opp'n at 1.  The Supreme Court has stated that

> [t]he "establishment of religion" clause of the First Amendment means at least this:  Neither a state nor the Federal Government can set up a

_____

[18] The government defendants argue that a request for declaratory relief cannot sustain this case.  In support of this argument, they cite *Golden v. Zwickler*, 394 U.S. 103 (1969), in which the Supreme Court concluded that no case or controversy of "sufficient immediacy and reality" allowed for a declaratory judgment where it was "most unlikely" that the plaintiff would ever again be subject to the statute at issue.  *Id.* at 109.  *See also Knight v. Mills*, 836 F.2d 659, 671 (1st Cir. 1987) (concluding that plaintiff's request for declaratory relief was moot where the record did not demonstrate "a reasonable  expectation that the feared violation will recur.").  Here, in contrast to *Zwickler* and *Knight*, it is not at all improbable that the challenged government action will recur.

church.  Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.  Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.  No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.  No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.  Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.  In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State."

*Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15-16 (1947) (citation omitted).

To determine whether a government action runs afoul of the Establishment Clause,

the Supreme Court has articulated three interrelated analytical approaches: the three-prong analysis set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971); the "endorsement" analysis, first articulated by Justice O'Connor in her concurrence in *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984), and applied by a majority of the Court in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989); and the "coercion" analysis of *Lee v. Weisman*, 505 U.S. 577, 587 (1992).[19]

*Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 7 (1st Cir. 2010).

The first of these analytical approaches – the *Lemon* test – encompasses three criteria that the government must meet if its actions are to be deemed religiously neutral.

First, the statute must have a secular legislative purpose; second, its

---

[19] The coercion analysis does not apply here, as the ACLU does not argue that the government defendants have coerced support of or participation in a particular religion.

principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon*, 403 U.S. at 612-613 (citations omitted).[20]  The ACLU argues that by authorizing the USCCB to impose a religiously based restriction on the use of TVPA funds, defendants have violated the second and third prongs of the *Lemon* test.

"Under the related endorsement analysis, courts must consider whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion."[21]  *Hanover Sch. Dist.*, 626 F.3d at 10.  "[T]he prohibition against

---

[20] In *Agostini v. Felton*, 521 U.S. 203 (1997), the Supreme Court treated the excessive entanglement inquiry as part of the effects prong, rather than as a separate prong.  *Id*. at 232-233.  The First Circuit recently noted that "[a]lthough the *Lemon* analysis has been often criticized, including by members of the Supreme Court, the Court has never expressly rejected it in cases such as this, and we have continued to apply it in the First Circuit.  The *Lemon* factors have, in the years since their first use in 1971, been described as 'no more than helpful sign posts.'" *Hanover Sch. Dist.*, 626 F.3d at 9 n.16 (citations omitted).

[21] Defendants define "the challenged government action" in this case variably: at times they frame it as the entire contract between HHS and the USCCB, *see, e.g.*, Gov. Defs.' Mem. at 10, while at other times they focus on the enactment of the TVPA, *see id*. at 12.  However, the ACLU does not claim that the enactment of the TVPA or the HHS-USCCB contract in its entirety violates the Establishment Clause.  Rather, the ACLU challenges only the government's authorization of the religiously based restriction on the use of TVPA funds.  For purposes of the endorsement analysis, the court will define the challenged government action as plaintiff ACLU has.  At the hearing on October 18, 2011, counsel for the government defendants agreed with the court's statement that "under an endorsement test, I think all we look at is the government action, not the statute or the statutory purposes as a whole." Oct. 18, 2011 Hr'g Tr. at 14.  *See Cnty. of Allegheny*, 492 U.S. at 592 (holding that the display of a

governmental endorsement of religion 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred*.'" *Cnty. of Allegheny*, 492 U.S. at 593 (citation omitted). To determine whether the government has endorsed or advanced a particular religious belief, the relevant inquiry is "'whether an objective observer, acquainted with the text, legislative history, and implementation of the statute [or other challenged government action], would perceive it as a state endorsement . . . .'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000), quoting *Wallace v. Jaffree*, 472 U.S. 38, 73 (1985) (O'Connor, J., concurring).[22]

---

crèche in a county courthouse violated the Establishment Clause and stating that "[i]n recent years, we have paid particularly close attention to whether the *challenged governmental practice* either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence.") (emphasis added); *Hanover Sch. Dist.*, 626 F.3d at 10 (stating that under the "endorsement analysis, courts must consider whether the *challenged governmental action* has the purpose or effect of endorsing, favoring, or promoting religion.") (emphasis added).

[22] The government defendants state that "the endorsement test is most commonly applied in the context of religious displays and religious expression," and that "no Supreme Court majority opinion has applied the endorsement test to a funding case." Gov. Defs.' Reply at 4. However, defendants cite no authority that explicitly limits the applicability of the endorsement test to cases involving religious displays and expression, and there is no reason to assume that the endorsement analysis would not be equally applicable here. There are cases outside of the religious display context in which the endorsement test has been at least implicitly applied. *See, e.g.*, *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 305 (holding that a school's policy of allowing student-led "invocations" prior to football games "involve[d] both perceived and actual

## A. Endorsement

The ACLU argues that to an objective observer, the government defendants would appear to have endorsed a Catholic belief by permitting the USCCB to place a religiously motivated restriction on reproductive services that beneficiaries of the TVPA program would otherwise have received. In support of this argument, the ACLU cites *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 708-711 (1985), which held that a Connecticut statute that provided Sabbath observers with a right not to work on their day of worship violated the Establishment Clause because it imposed on employers and employees an absolute duty to conform their business practices to the particular religious observances of an employee. *See also id.* at 711 (O'Connor, J., concurring) (finding that the Connecticut statute "conveys a message of endorsement of the Sabbath observance," and that "an objective observer or the public at large would perceive this statutory scheme . . . . [as] one of endorsement of a particular religious belief, to the detriment of those who do not share it.").

---

endorsement of religion."); *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 431 (2d Cir. 2002) (finding kosher food statutes unconstitutional where they "produce an *actual* joint exercise of governmental and religious authority," which is "prohibited by the Establishment Clause because of the danger that the government's action will be 'perceived by [some] as an endorsement of their religious choices, or by [others] as a disapproval of their own.'"); *Foremaster v. City of St. George*, 882 F.2d 1485, 1489 (10th Cir. 1989) (concluding that "the Constitution required the City to terminate the electric subsidy" to a local Mormon temple because the subsidy "conveyed a message of City support for the [Mormon] faith.").

The USCCB, for its part, argues that the government's acceptance of the abortion/contraception restriction is an accommodation of religious belief and not an endorsement of a sectarian view. In support of this argument, the USCCB cites case law holding that an accommodation of religion is not equivalent to an endorsement of religious belief. *See, e.g.*, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) (applying rational basis analysis to test the constitutionality of a statute exempting secular nonprofit activities of religious organizations from the requirements of Title VII). However, as counsel for the USCCB stated at oral argument, HHS's authorization of the abortion/contraception restriction is "strictly speaking, not an accommodation because the TVPA does not require the provision of abortion or contraceptive services. It permits it, but it doesn't require it. So the government, by accepting the conscience clause in this case, did not relieve [the] USCCB of a legal obligation." Oct. 18, 2011 Hr'g Tr. at 39.

Even if viewed as an accommodation of the USCCB's religious beliefs, the government's authorization of the abortion/contraception restriction would not necessarily pass constitutional muster. In *Amos*, the Supreme Court noted that "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion . . . .'" 483 U.S. at 334-335, quoting *Hobbie v. Unemp't Appeals Comm'n of Florida*, 480 U.S. 136, 145 (1987). The Supreme Court reiterated the limited nature of permissible

20

religious accommodations in *Board of Education of Kiryas Joel Village School District*

*v. Grumet*, 512 U.S. 687 (1994):

> accommodation is not a principle without limits, and what petitioners seek is an adjustment to the Satmars' religiously grounded preferences that our cases do not countenance. Prior decisions have allowed religious communities and institutions to pursue their own interests free from governmental interference, but we have never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation. Petitioners' proposed accommodation singles out a particular religious sect for special treatment, and whatever the limits of permissible legislative accommodations may be, it is clear that neutrality as among religions must be honored.

*Id.* at 706-707 (internal citations omitted).

Beliefs about the morality of abortion and the use of contraceptives need not be based on a religious viewpoint. But here there is no reason to question the sincerity of the USCCB's position that the restriction it imposed on its subcontractors on the use of TVPA funds for abortion and contraceptive services was motivated by deeply held religious beliefs.[23] In this respect, the present case is distinguishable from those relied

---

[23] As discussed previously, the USCCB's Technical Proposal and Amended Technical Proposal (which were both incorporated into the final contract between HHS and the USCCB) stated, "*as we are a Catholic organization*, we need to ensure that our victim services are not used to refer or fund activities that would be contrary to our moral convictions and religious beliefs. Therefore, we would explain to potential subcontractors our disclaimer of the parameters within which we can work. Specifically, subcontractors could not provide or refer for abortion services or contraceptive materials for our clients pursuant to this contract." *See* USCCB's Resp. to Pl.'s SOF ¶¶ 28, 46 (emphasis added); USCCB's Supplemental Mem. at 2 (citing

upon by the government defendants – *Bowen v. Kendrick*, *Harris v. McCrae*, and *McGowan v. Maryland* – all of which involved challenges to government actions that coincided with religious beliefs, but were not found to be explicitly motivated by the beliefs of a particular religious group. *See Bowen v. Kendrick*, 487 U.S. 589, 605 (1988) (upholding the eligibility of religious groups to receive funding under the Adolescent Family Life Act (AFLA), reasoning that AFLA's "approach is not inherently religious, although it may coincide with the approach taken by certain religions."); *Harris v. McCrae*, 448 U.S. 297, 319 (1980) (rejecting an Establishment Clause challenge to the Hyde Amendment, which limits federal funding for abortion, reasoning that "[t]he Hyde Amendment . . . is as much a reflection of 'traditionalist' values towards abortion, as it is an embodiment of the views of any particular religion."); *McGowan v. Maryland*, 366 U.S. 420, 444 (1961) (upholding Maryland's Sunday closing laws against an Establishment Clause challenge, reasoning that "[i]n light of the evolution of our Sunday Closing Laws through the centuries, and of their more or less recent emphasis upon secular considerations, it is not difficult to discern that as presently written and administered, most of them, at least, are of a secular rather

---

the USCCB's "moral and religious objections to facilitating abortion or contraception"); Gov. Defs.' Mem. at 1-2 (acknowledging that "the funding restriction on abortion services and contraceptive materials was proposed by [the] USCCB for religious reasons . . . .").

than of a religious character, and that presently they bear no relationship to establishment of religion as those words are used in the Constitution of the United States.").

This case is also distinguishable from *Hanover School District*, in which the First Circuit held that the New Hampshire School Patriot [Pledge of Allegiance] Act did not violate the Establishment Clause.  In its analysis, the First Circuit emphasized the voluntary nature of the Pledge of Allegiance ceremony, under which "both the choice to engage in the recitation of the Pledge and the choice not to do so are entirely voluntary."  *Hanover Sch. Dist.*, 626 F.3d at 11.  Here, by contrast, the restriction on the use of TVPA funds for abortion services and contraceptive materials is not a subject of truly voluntary participation; subcontracting organizations and trafficking victims cannot "opt out" of the restriction without shouldering the financial burden of doing so.[24]

## B.  Delegation of Authority

The ACLU further argues that by impermissibly delegating discretion to the

---

[24] The government defendants note that despite the restriction, "subcontractors may use their own funding to provide abortion and contraceptive services."  Gov. Defs.' Reply at 5.  The pertinent issue, however, is not the allocation of financial burdens among the service providers; rather, it is whether the shifting of costs based on religious dogma violates the Establishment Clause when taxpayer money is involved.

USCCB to decide which services would be offered under the TVPA, and which would not, the government defendants violated their constitutional obligations under the second and third prongs of the *Lemon* test.[25]  In support of this argument, the ACLU cites *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), which held that a Massachusetts statute that vested in the governing bodies of schools and churches the power to block the issuance of liquor licenses for establishments within a 500-foot radius of the church or the school could "be seen as having a 'primary' and 'principal' effect of advancing religion," and "enmeshe[d] churches in the exercise of substantial governmental powers contrary to our consistent interpretation of the Establishment Clause . . . ." *Id.* at 126.  In reaching this conclusion, the Supreme Court reasoned that the "Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127.  *See Kiryas Joel*, 512 U.S. at 696; *see also Commack Self-Serv. Kosher Meats*, 294 F.3d at 430 (holding that the challenged kosher food statutes "fail the second prong of the *Lemon* test . . . . because they (1) have a primary effect that both advances religion, by preferring the dietary restrictions of Orthodox Judaism over those of other

---

[25] Under the TVPA, and pursuant to the statutory authority for the RFP, 8 U.S.C. § 1522(c)(1)(A), the government defendants are charged with providing services to individuals trafficked into the United States. *See* Pl.'s SOF ¶¶ 20-21; USCCB's Resp. to Pl.'s SOF ¶¶ 20-21.

branches, and inhibits religion, by effectively prohibiting other branches from using the kosher label in accordance with their religious beliefs, and (2) create an impermissible joint exercise of religious and civic authority that advances religion."); *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995) (stating that under the second prong of the *Lemon* test, the relevant question "is not the subjective intent of the [governmental body] in enacting the [challenged action], but whether the objective effect of [the challenged action] is to suggest government preference for a particular religious view or for religion in general"; and finding that "[a]lthough the City has not expressly endorsed Orthodox Judaism or encouraged its practice by passing the [kosher food consumer fraud municipal] ordinance, the incorporation of the Orthodox standard creates an impermissible symbolic union of church and state.").

Here, as in *Grendel's Den, Kiryas Joel, Commack,* and *Barghout*, the government defendants' delegation of authority to the USCCB to exclude certain services from government funding "provides a significant symbolic benefit to religion," in violation of the Establishment Clause. *See Grendel's Den*, 459 U.S. at 125-126. This conclusion is buttressed by the fact that the government defendants' authorization of the abortion/contraception funding restriction represents a deviation from their ordinary practices. In *Kiryas Joel*, the Supreme Court held unconstitutional a New

York state statute that "ran counter to customary [school] districting practices in the State" and "delegat[ed] the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally." 512 U.S. at 696, 700.

The government defendants attempt to distinguish *Kiryas Joel* from the present case with the conclusory statement that here, "HHS evaluated [the] USCCB's proposal in response to the RFP using 'customary and neutral principles' without any religious motivation." Gov. Defs.' Reply at 4 n.2, quoting *Kiryas Joel*, 512 U.S. at 702. This may have been true at the outset. However, during the bidding process, the USCCB made clear its intention to distribute the TVPA funds in a manner it deemed consistent with Catholic beliefs. HHS's ultimate delegation to the USCCB of the discretion to prohibit the use of TVPA funds for abortion services and contraceptive materials was neither customary nor neutral. It is not a matter of dispute that prior to awarding the TVPA contract to the USCCB, the government defendants "did not impose any prohibition on the use of TVPA funds for abortion or contraception referrals, or contraceptive services." Pl.'s SOF ¶ 17; Gov. Defs.' Resp. to Pl.'s SOF ¶ 17. Moreover, the government defendants now take the position that "HHS no longer intends to assist human trafficking victims through a single, nationwide contract;

instead funding is provided through multiple grant awards that *give strong preference to organizations that will make referrals for the full range of legally permissible obstetrical and gynecological services, including abortion and contraception*." Gov. Defs.' Opp'n to USCCB's Supplemental Mem. at 7-8 (emphasis added).

As I stated in my March 22, 2010 Memorandum and Order, "I have no present allegiance to either side of the debate, only a firm conviction that the Establishment Clause is a vital part of the constitutional arrangement envisioned by the Framers, and perhaps a reason we have not been as riven by sectarian disputes as have many other societies." Mar. 22, 2010 Mem. & Order at 21. That conviction remains unshaken. To insist that the government respect the separation of church and state is not to discriminate against religion; indeed, it promotes a respect for religion by refusing to single out any creed for official favor at the expense of all others. *See Kiryas Joel*, 512 U.S. at 696 ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents.") (internal quotations omitted); *Cnty. of Allegheny*, 492 U.S. at 610 ("The government does not discriminate against any citizen on the basis of the citizen's religious faith if the government is secular in its functions and operations. On the contrary, the Constitution mandates that the government remain secular, rather than

affiliate itself with religious beliefs or institutions, precisely in order to avoid discriminating among citizens on the basis of their religious faiths.").[26]

ORDER

For the foregoing reasons, the ACLU's motion for summary judgment is ALLOWED. It is therefore ADJUDGED and DECLARED that the government defendants violated the Establishment Clause of the First Amendment to the United States Constitution, insofar as they delegated authority to a religious organization to impose religiously based restrictions on the expenditure of taxpayer funds, and thereby impliedly endorsed the religious beliefs of the USCCB and the Catholic Church. The government defendants' motion for summary judgment is DENIED. The USCCB's motion to dismiss and motion for summary judgment are DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[26] Let me add one final note. This case is not about government forcing a religious institution to act contrary to its most fundamental beliefs. No one is arguing that the USCCB can be mandated by government to provide abortion or contraceptive services or be discriminated against for its refusal to do so. Rather, this case is about the limits of the government's ability to delegate to a religious institution the right to use taxpayer money to impose its beliefs on others (who may or may not share them).