# United States Court of Appeals
## For the First Circuit

———————————————

Nos. 12-1466, 12-1658

AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS,

Plaintiff, Appellee,

v.

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,

Defendant, Appellant,

KATHLEEN SEBELIUS, Secretary of the Department of Health and
Human Services; GEORGE SHELDON, Acting Assistant Secretary for
the Administration of Children and Families; ESKINDER NEGASH,
Director of the Office of Refugee Resettlement,

Defendants.

———————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

———————————————

Before

Lynch, Chief Judge,
Torruella, Circuit Judge,
and DiClerico,[*] District Judge.

———————————————

Lowell V. Sturgill, Jr., Attorney, Appellate Staff Civil
Division, U.S. Department of Justice, with whom Stuart F. Delery,
Assistant Attorney General, Carmen Ortiz, United States Attorney,
Beth S. Brinkmann, Deputy Assistant Attorney General, and Matthew
M. Collette, Attorney, Appellate Staff Civil Division, U.S.
Department of Justice, were on brief, for defendants Kathleen

————————————————

[*] of the District of New Hampshire, sitting by designation.

Sebelius, et al.

    Henry C. Dinger, with whom Catalina Azuero, Goodwin Procter LLP, Anthony R. Picarello, Jr., and Jeffrey Hunter Moon, were on brief, for defendant-appellant United States Conference of Catholic Bishops.

    James L. Hirsen and Deborah J. Dewart on brief for Justice and Freedom Fund, amicus curiae.

    Eric Rassbach and S. Kyle Duncan on brief for The Becket Fund for Religious Liberty et al., amicus curiae.

    Brigitte Amiri, with whom Andrew D. Beck, Rose Ann Saxe, Daniel Mach, Heather L. Weaver, and Sarah R. Wunsch, were on brief, for plaintiff-appellee American Civil Liberties Union of Massachusetts.

    Alex J. Luchenitser, Ayesha N. Khan, Steven M. Freeman, David L. Barkey, Robert O. Trestan, K. Hollyn Hollman, and Gretchen S. Futrell on brief for Americans United for Separation of Church and State et al., amicus curiae.

    Gabrielle Viator, Assistant Attorney General, Martha Coakley, Attorney General of Massachusetts, and Genevieve C. Nadeau, Assistant Attorney General, on brief for Commonwealth of Massachusetts, amicus curiae.

    Eliza M. Scheibel, Anne Harkavy, P. Patty Li, and Wilmer Cutler Pickering Hale and Dorr LLP on brief for Organizations Serving Trafficking Victims, amicus curiae.

---

January 15, 2013

---

**LYNCH**, **Chief Judge**.  The American Civil Liberties Union of Massachusetts (ACLUM), asserting taxpayer standing on behalf of its members, brought suit in 2009 alleging that the U.S. Department of Health and Human Services (HHS) violated the Establishment Clause of the First Amendment.  HHS had received funds appropriated by Congress under the Trafficking Victims Protection Act (TVPA) and, in 2006, contracted with the United States Conference of Catholic Bishops (USCCB) to provide services to trafficking victims.  At the insistence of USCCB, the 2006 contract incorporated a restriction under which neither USCCB nor any of its subcontractors would use funding to counsel or provide abortions or contraceptive services and prescriptions to trafficking victims.

In March of 2012, the district court awarded relief to ACLUM issuing a declaratory judgment that HHS had violated the Establishment Clause "insofar as they delegated authority to a religious organization to impose religiously based restrictions on the expenditure of taxpayer funds, and thereby impliedly endorsed the religious beliefs of the USCCB and the Catholic Church." Am. Civil Liberties Union of Mass. v. Sebelius, 821 F. Supp. 2d 474, 488 (D. Mass. 2012).  The 2006 contract, along with its extensions, expired in October of 2011.

We vacate on grounds of mootness and remand with instructions to dismiss.

-3-

I.

The problem of human trafficking, as all parties recognize,[1] is considerable and very serious.  Human trafficking "is a widespread form of modern-day slavery," U.S. Dep't of Justice, Attorney General's Annual Report to Congress and Assessment of U.S. Government Activities to Combat Trafficking in Persons: Fiscal Year 2008, at 1 (2009), with an estimated 27 million victims worldwide, see U.S. Dep't of State, Trafficking in Persons Report 7 (2012).  This pandemic disproportionately affects women and girls, who account for 98% of individuals trafficked to perform commercial sex acts and  55% of those trafficked to provide forced labor.  Id. at 45; see also D. Banks & T. Kyckelhahn, U.S. Dep't of Justice, Characteristics of Suspected Trafficking Incidents, 2008-2010, at 6 (2011).  These women and girls are typically subject to a variety of abuses, including rape and other forms of sexual assault, and they may seek abortions, contraceptives, and other medical services.

On October 28, 2000, Congress passed the TVPA, Pub. L. No. 106-386, 114 Stat. 1464 (2000) (codified as amended at 22 U.S.C. § 7101 et seq.), to "combat trafficking in persons," "ensure just and effective punishment of traffickers," and "protect their victims," 22 U.S.C. § 7101(a).  In its victim services mandate, the TVPA directs the Secretary of HHS, subject to the availability of

---

[1]  We express our appreciation to the amici on both sides.

-4-

congressional appropriations, to expand the benefits and services offered to human trafficking victims residing in the United States. Id. § 7105(b)(1)(B).   Since fiscal year 2001, Congress has appropriated $5 to $10 million annually to HHS to carry out that mandate.   See, e.g., Consolidated Appropriations--FY 2001, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-22 (2000); Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3249-50 (2009).

Shortly after Congress passed the TVPA, HHS began implementing the victim services mandate through a series of competitively selected grants to direct service providers.   See, e.g., ORR Announcement for Services To Victims of a Severe Form of Trafficking, 67 Fed. Reg. 36,622, 36,623 (May 24, 2002).   HHS later determined that these grants were inefficient and ineffective, due to geographic and other limitations.[2]

In November of 2005, these problems prompted HHS to alter its approach to the distribution of funds under the victim services mandate.   Rather than issuing multiple grants to individual service providers, HHS decided to award a single contract to administer the

---

[2] For example, services for trafficking victims were limited to the geographic locations of HHS's grantees and victims outside of these areas were often unaware that services were available. Additionally, some grantees did not maintain a caseload of victims sufficient in size to justify the resources made available by their grants.   As of February 25, 2005, only 711 victims had been served through HHS's direct grants, less than ten percent of the estimated number of victims who enter the U.S. each year.

agency's TVPA funds nationwide.   HHS would then reimburse the organization selected, on a "per capita" basis, for the benefits and services it provided to trafficking victims.[3]

On November 9, 2005, HHS published a Request for Proposals (RFP) for the nationwide contract.   The RFP explained that the award recipient would furnish, either directly or through other organizations, "case management, benefits coordinating, and counseling services" to trafficking victims.   The contractor would also expend TVPA funds on certain direct services, including medical care, therapy, and other forms of assistance.   The TVPA did not require HHS to ensure that taxpayer funds were made available to provide abortions or contraceptive services to trafficking victims, and the RFP did not preclude organizations which refused to provide these services from submitting a proposal.

HHS received timely proposals from two organizations, both religiously affiliated: USCCB and the Salvation Army.   Based upon its own religious and moral convictions, USCCB's proposal included a restriction on the services it would fund if awarded the nationwide contract:

> [A]s we are a Catholic organization, we need
> to ensure that our victim services are not
> used to refer or fund activities that would be

---

[3]   The agency anticipated that a "per capita" funding model would ameliorate many of the problems associated with the direct grant program.   Because the contractor would receive funds in proportion to the number of victims served, it had incentives to identify as many trafficking victims and provide services in as many regions as possible.

> contrary to our moral convictions and
> religious beliefs. Therefore, we would
> explain to potential subcontractors our
> disclaimer of the parameters within which we
> can work. Specifically, subcontractors could
> not provide or refer for abortion services or
> contraceptive materials for our clients
> pursuant to this contract.

Sebelius, 821 F. Supp. 2d at 476-77 (emphasis omitted).

HHS convened a four-member "technical evaluation panel" to review the contract proposals. Based upon four criteria specified in the RFP -- organizational profile, approach, staff and position data, and past experience -- the panel gave USCCB's proposal a technical score of 89.00 (out of 100.00) and Salvation Army's proposal a technical score of 71.75. Two of the panel members raised concerns about USCCB's services restriction, which they expressed through a series of written questionnaires to USCCB. In response, USCCB clarified that it would not agree to a "don't ask, don't tell" policy on abortion and contraception, and that it would not use, or permit to be used, any TVPA funds for activities covered by the restriction. Id. at 477.

In February of 2006, HHS allowed both organizations to submit revised technical proposals. The panel gave USCCB's revised proposal a technical score of 93.75, noting the restriction as one of its weaknesses. Salvation Army's revised proposal received a technical score of 75.00. As to costs, the panel estimated that USCCB's proposal would require approximately $29 million in total funding as compared to $89 million for Salvation Army's proposal.

HHS awarded the nationwide contract to USCCB on March 29, 2006 (HHS-USCCB contract).

The HHS-USCCB contract was signed on April 11, 2006.  It had an initial term of one year, with options for four annual renewals thereafter, each of which HHS exercised.  Throughout this contractual period, USCCB did not provide services directly to trafficking victims, but subcontracted with upwards of 100 other organizations that did so.  USCCB's subcontracts specified what costs were and were not reimbursable.  Non-reimbursable costs included, among others, "abortion counseling/services" and "abortive/contraceptive prescriptions."  USCCB did not, however, exclude any organization from becoming a subcontractor on the basis of that organization's provision of abortion or contraception services, it simply forbade reimbursement for such services.  Subcontractors were able to furnish these services at their own expense or through funding acquired from other sources.  Over the first four years of this arrangement, USSCB's subcontractors served an estimated 2,254 trafficking victims at around one-fifth the cost per victim of the earlier grant program.

HHS exercised the fourth and final contract option in April of 2010, which expired on April 10, 2011.  Before the option expired, HHS approved a six-month extension, called a "task order," pursuant to 48 C.F.R. § 52.217-8.  That task order expired on October 10, 2011.  _Sebelius_, 821 F. Supp. 2d at 478.  Thereafter,

HHS had no authority to obligate additional funding under the HHS-USCCB contract, although it could reimburse USCCB for services which had been rendered before October 10, 2011.  On April 17, 2012, one month after the district court issued its opinion, USCCB stated that it had completed all reimbursements under the contract. In sum, HHS awarded USCCB approximately $16 million under the contract over the course of five and a half years.

On May 27, 2011, HHS announced that it would return to a grant-based model to fulfill the victim services mandate.  The Funding Opportunity Announcement (FOA) prepared for the new grants made clear that HHS funds could be expended for an abortion in certain limited circumstances[4] and that HHS would give "strong preference" to applicants willing to offer "the full range of legally permissible gynecological and obstetric care."  These terms were markedly different from those in the 2005 RFP.

On October 12, 2011, HHS awarded grants to three organizations.  Each grant has an expected term of 36 months, subject to the continued availability of federal funds and satisfactory progress by the grantee.  Although USCCB applied to receive a grant, its proposal was not selected.

---

[4]  The Consolidated Appropriation Act, 2010, Pub. L. No. 111-117, § 4, div. D, tit. V, secs. 507-508(a), 123 Stat. 3034, 3280 (2009), limited the use of TVPA funds for abortions to cases involving rape, incest, or life endangerment.

II.

On January 12, 2009, almost three years after the HHS-USCCB contract was adopted, the ACLUM filed suit in the District of Massachusetts against the Secretary of HHS and two other federal officials in their official capacities alone.[5]  The complaint alleged that the federal defendants "violated and continue[d] to violate the Establishment Clause of the First Amendment by permitting USCCB to impose a religiously based restriction on the use of taxpayer funds."  The ACLUM sought: (1) a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the federal defendants violated the Establishment Clause; (2) a permanent injunction ordering the federal defendants "to ensure that the TVPA grant is implemented without the imposition of religiously based restrictions"; and (3) costs, fees, nominal damages, and any other relief the court deemed appropriate.  USCCB intervened as a defendant in June of 2010.

On March 23, 2012, the district court resolved cross-motions for summary judgment in favor of the ACLUM.  Sebelius, 821 F. Supp. 2d at 488.  The district court held that the ACLUM, on behalf of its members, had taxpayer standing to challenge the HHS-USCCB contract on Establishment Clause grounds, id. at 478-80; that

_____

[5]    The named federal defendants were Michael O. Leavitt, Secretary of HHS; Daniel Schneider, Acting Assistant Secretary for the Administration for Children and  Families; and David H. Siegel, Acting Director of the Office of Refugee Resettlement.  On appeal, these defendants have been replaced by the successors to their respective federal positions.

the HHS-USCCB contract's expiration had not rendered the ACLUM's challenge moot, id. at 480-82; and that the federal defendants had violated the Establishment Clause either by endorsing or appearing to endorse USCCB's religiously based views, id. at 484-486, or by impermissibly delegating authority to USCCB to impose those views on others, id. at 486-88.

The district court concluded that the ACLUM's challenge was not moot because it fell under the "voluntary cessation" exception to the mootness doctrine.  Having determined that HHS voluntarily ceased the challenged conduct, to prevail on mootness grounds, the federal defendants had to show that it was "absolutely clear" they would not resume that conduct.  Relying on USCCB's contention that it would continue to seek HHS contracts and grants, and on a long history of partnership between HHS and USCCB, the district court determined that the federal defendants could not meet this burden.  Id. at 481-82.  Independently, the district court noted that the ACLUM sought a declaratory judgment, and concluded that it was obliged to reach the merits on the basis of this request.  Id. at 482.  Both rulings were in error.  The district court went on to find that declaratory relief was appropriate and issued a judgment that the federal defendants had violated the Establishment Clause.  Id. at 488.

On May 22, 2012, this timely appeal ensued.

III.

On appeal, the federal defendants challenge the district court's conclusions that the case was not moot, that the ACLUM had taxpayer standing, and that the HHS-USCCB contract was in violation of the Establishment Clause, and seek to vacate or reverse the district court's grant of relief.  USCCB appeals only as to standing and the merits.[6]  The ACLUM argues that "this Court should affirm the district court's decision in its entirety," and does not request any alternative form of relief.

We begin and end our analysis on the issue of mootness. Mootness is a ground which should ordinarily be decided in advance of any determination on the merits.  See <u>Arizonans for Official English</u> v. <u>Arizona</u>, 520 U.S. 43, 67 (1997). Further, we are obligated to follow the doctrine of constitutional avoidance, under which federal courts are not to reach constitutional issues where alternative grounds for resolution are available.  See <u>Mills</u> v. <u>Rogers</u>, 457 U.S. 291, 305 (1982); <u>Ashwander</u> v. <u>Tenn. Valley Auth.</u>, 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring).

The HHS-USCCB contract, and any use of taxpayer funds authorized by it, whether constitutional or not, has now ended, as of either October 10, 2011, when the contract expired, or at the latest on April 17, 2012, when USCCB announced that it had no

---

[6]  USCCB did not address mootness until its reply brief, where it stated that "USCCB opposed the government's arguments [on mootness] below, and will not repeat its arguments here."

-12-

outstanding invoices for services rendered prior to the contract's expiration.  Moreover, HHS has awarded new grants to three different organizations, each for a term of 36 months.  The ACLUM admits these grants do not raise Establishment Clause concerns.  These new grants were made pursuant to HHS's new terms, which endorse a "strong preference" for organizations willing to provide abortion and contraceptive services.  The federal defendants argue that these events have mooted the ACLUM's challenge.  We agree.

"The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'"  Manqual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003) (quoting Steffel v. Thompson, 415 U.S. 452, 460 n.10 (1974)).  The burden of establishing mootness rests with the party invoking the doctrine, Conservation Law Found. v. Evans, 360 F.3d 21, 24 (1st Cir. 2004), in this instance the federal defendants.  Where, as here, there are no factual findings which bear on the matter, we review the trial court's mootness determination de novo.  See Brown v. Colegio de Abogados de P.R., 613 F.3d 44, 48 (1st Cir. 2010); Adams v. Bowater Inc., 313 F.3d 611, 613 (1st Cir. 2002).

This court, employing the Supreme Court's terminology, has provided various formulations of what makes a case moot. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in

the outcome." <u>D.H.L. Assocs., Inc.</u> v. <u>O'Gorman</u>, 199 F.3d 50, 54 (1st Cir. 1999) (quoting <u>Powell</u> v. <u>McCormack</u>, 395 U.S. 486, 496 (1969)) (internal quotation marks omitted).   "Another way of putting this is that a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party." <u>Horizon Bank & Trust Co.</u> v. <u>Massachusetts</u>, 391 F.3d 48, 53 (1st Cir. 2004) (citing <u>Church of Scientology of Cal.</u> v. <u>United States</u>, 506 U.S. 9, 12 (1992)).   And, "[i]f events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case." <u>Mangual</u>, 317 F.3d at 60; <u>Libertarian Party of N.H.</u> v. <u>Gardner</u>, 638 F.3d 6, 12 (1st Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 402 (2011).   Under any of these formulations, the ACLUM's challenge to the HHS-USCCB contract is moot.

It is ordinarily true that a challenge to a contract becomes moot upon that contract's expiration. <u>See</u>, <u>e.g.</u>, <u>Columbian Rope Co.</u> v. <u>West</u>, 142 F.3d 1313, 1316-17 (D.C. Cir. 1998); <u>James Luterbach Constr. Co., Inc.</u> v. <u>Adamkus</u>, 781 F.2d 599, 602 (7th Cir. 1986); <u>cf.</u> <u>Air Line Pilots Ass'n, Int'l</u> v. <u>UAL Corp.</u>, 897 F.2d 1394, 1398 (7th Cir. 1990) ("[W]e agree that if the expiration clause [made the contract expire] . . . last year, the case is moot and we are required to vacate [the trial court's] order . . . ."). This is also the rule in challenges to expired or exhausted government grants, <u>see</u>, <u>e.g.</u>, <u>Maine</u> v. <u>U.S. Dep't of Labor</u>, 770 F.2d 236, 239 (1st Cir. 1985); <u>Caldwell</u> v. <u>Caldwell</u>, 545 F.3d 1126,

1130 (9th Cir. 2008); Campesinos Unidos, Inc. v. U.S. Dep't of Labor, 803 F.2d 1063, 1068 (9th Cir. 1986), and to government regulatory schemes which have expired or been effectively repealed, see, e.g., New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 18 (1st Cir. 2002).

These challenges are moot for a number of reasons. One is that there is literally no controversy left for the court to decide -- the case is no longer "live." Powell, 395 U.S. at 496. Once a contract has expired, and the obligations between its signatories have ended, and if no damages are sought, the parties usually do not have a legally cognizable interest in the case's outcome.[7]

A second and independent reason for mootness is that a court cannot provide meaningful relief to the allegedly aggrieved party. This is clearest in cases where the only relief requested is an injunction. Once a contract has expired, there is no ongoing conduct left for the court to enjoin. Columbian Rope, 142 F.3d at 1316; Campesinos Unidos, 803 F.2d at 1068.

---

[7] Although the federal complaint sought nominal damages, the ACLUM has waived that request on appeal by not arguing the matter in its brief. See, e.g., Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch., 457 F.3d 376, 380 n.1 (4th Cir. 2006). Even if the argument were not waived, no nominal damages are available. As the federal defendants argued before the trial court, a claim for nominal damages is foreclosed by HHS's sovereign immunity. See FDIC v. Meyer, 510 U.S. 471, 475 (1994); see also County of Suffolk v. Sebelius, 605 F.3d 135, 141-42 (2d Cir. 2010).

With limited exceptions, not present here, issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory.  <u>Maine</u>, 770 F.2d at 239; <u>O'Connor</u> v. <u>Washburn Univ.</u>, 416 F.3d 1216, 1221 (10th Cir. 2005); <u>James Luterbach</u>, 781 F.2d at 602.  The Supreme Court has admonished that federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong."  <u>Spencer</u> v. <u>Kemna</u>, 523 U.S. 1, 18 (1998); <u>see</u> <u>also</u> <u>United States</u> v. <u>Reid</u>, 369 F.3d 619, 624 (1st Cir. 2004).

While the district court was correct to independently consider the availability of declaratory relief, <u>see</u> <u>Super Tire Eng'g Co.</u> v. <u>McCorkle</u>, 416 U.S. 115, 121 (1974), it failed to apply the appropriate test.  For declaratory relief to withstand a mootness challenge, the facts alleged must "show that there is a substantial controversy . . . <u>of sufficient immediacy and reality</u> <u>to warrant the issuance of a declaratory judgment</u>."  <u>Preiser</u> v. <u>Newkirk</u>, 422 U.S. 395, 402 (1975) (quoting <u>Md. Cas. Co.</u> v. <u>Pac.</u> <u>Co.</u>, 312 U.S. 270, 273 (1941)) (internal quotation mark omitted). The controversy here is at this point neither immediate nor real. The HHS-USCCB contract has expired and the appropriated tax dollars set aside for it have been spent.

Beyond that, HHS has awarded new grants to implement the victim services mandate and these grants do not raise Establishment

Clause concerns.  "The case has therefore lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law."  Hall v. Beals, 396 U.S. 45, 48 (1969).  As such, the claim for declaratory relief is moot.  See Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc., 404 U.S. 412, 415 (1972).

Since the controversy at issue is not live, and the requested relief is not available, the ACLUM must rely on an exception to the mootness doctrine.  We consider these exceptions separately and explain why they do not apply here.

A.        "Voluntary Cessation"

The district court found, and the ACLUM argues now, that this case falls into the "voluntary cessation" exception to mootness articulated in City of Mesquite v. Aladdin's Castle, 455 U.S. 283 (1982).  As its name suggests, this exception arises in situations where "the defendant voluntary ceases the challenged practice," D.H.L. Assocs., 199 F.3d at 55, thereby mooting the plaintiff's case.  Our review of the district court's finding is de novo.  Id. at 54.

The ACLUM argues that this case qualifies as a voluntary cessation because HHS freely chose not to award a grant to USCCB under the new program.  The federal defendants respond that what occurred here was not a voluntary cessation at all, and so the exception cannot be invoked.  The HHS-USCCB contract expired in the

ordinary course of events, not because of any actions taken by HHS. The fact that HHS chose to award a new set of grants to different organizations does not avoid mootness.[8]

The voluntary cessation exception does not save the ACLUM's challenge.  The purposes for which the exception exists are not met here.  Further, even if the facts could be thought of in terms under which HHS has voluntarily ceased a challenged activity, the tests for application of the exception have not been satisfied.

The voluntary cessation exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."  City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n.1 (2001).  This is to avoid a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.  See Already, LLC v. Nike, Inc., No. 11-982, slip op. at 4 (U.S. Jan. 9, 2013); Brown, 613 F.3d at 49; see also United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953) (noting

---

[8] The federal defendants have largely staked their position on the argument that there was no voluntary cessation so as to invoke the exception at all.  They do argue that whether there is a likelihood of recurrence is mostly relevant to the exception to mootness for cases capable of repetition yet likely to evade review.  We do not share their confidence that there is such categorical neatness.  To the extent the federal defendants may be viewed as arguing there is an implied per se rule that contract and payment obligation expiration causes mootness without any possible exception, we do not agree.

that if a court declares the case moot, "[t]he defendant is free to return to his old ways").  As the Supreme Court stated last term, "[s]uch . . . maneuvers designed to insulate a decision from review . . . must be viewed with a critical eye" and, as a result, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot."  Knox v. Serv. Emps. Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) (citation omitted).  However, even in circumstances where the voluntary cessation exception applies, a case may still be found moot if the defendant meets "the formidable burden[9] of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000) (citing United States v. Concentrated Phosphate Exp. Ass'n, Inc., 393 U.S. 199, 203 (1968)); Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007).

This, in our view, is not a case of voluntary cessation so as to invoke the exception.  "The voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation." M. Redish, Moore's Fed. Practice, § 101.99[2]; see Jordan v. Sosa,

---

[9]  It is not a purpose of the doctrine to require an admission from the defendant that the now ceased conduct was illegal. "Mootness turns on future threats, not upon penance."  Adams, 313 F.3d at 615.

654 F.3d 1012, 1037 (10th Cir. 2011); <u>Sze</u> v. <u>INS</u>, 153 F.3d 1005, 1008-09 (9th Cir. 1998).  The HHS-USCCB contract expired according to its terms.  HHS did nothing to hasten its expiration, much less do so to terminate litigation; indeed, HHS continued to exercise options even after the ACLU filed suit.  Moreover, the expiration date, options, and task order extension were all built into the contract's terms before this litigation began.

Circuit courts have routinely held that the voluntary cessation exception is not invoked when the challenged conduct ends because of an event that was scheduled before the initiation of the litigation, and is not brought about or hastened by any action of the defendant.  For example, in <u>O'Connor</u>, 416 F.3d 1216, a challenge was brought to a temporary art exhibition, and the exhibition ended according to its predetermined schedule during the pendency of the litigation.  <u>Id.</u> at 1221-22.  The Tenth Circuit held that the claims for declaratory and injunctive relief were moot and that a voluntary cessation had not occurred because "the controversy has become moot through the normal course of events rather than through the unilateral action of the defendant." <u>Id.</u> at 1222; <u>see also</u> <u>County of Suffolk</u>, 605 F.3d at 139-42 (where plaintiff asserts claim it was entitled to HHS Comprehensive AIDS Resources Emergency Act funding because it had been wrongly classified, its claims were moot as to fiscal years where HHS had already distributed all appropriated funds).  The purpose of the

contract expiration here was not to moot the litigation.  We have no basis for skepticism otherwise.

The exception, to be invoked, also requires some reasonable expectation of recurrences of the challenged conduct. Under circuit precedent, the voluntary cessation exception can be triggered only when there is a reasonable expectation that the challenged conduct will be repeated following dismissal of the case. See, e.g., Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 93 (1st Cir. 2004); Council of Carpenters, 284 F.3d at 18; D.H.L. Assocs., 199 F.3d at 55.

Here there is also no reasonable expectation of recurrence.  HHS has altered the terms for awarding funds under the TVPA to give preference to organizations which provide the services that the ACLUM wishes to see provided.  The new grants awarded under these terms have a three-year time period.  Thus, unlike cases where the exception has been held to apply, here we can safely assume that for the foreseeable future the challenged contract terms will not recur.  See Caldwell, 545 F.3d at 1130 (finding claim moot where challenged grant expired and no alternative source of funding was likely to emerge (citing Chandler v. Miller, 520 U.S. 305, 313 n.2 (1997))).

We give some weight in our analysis to the fact that the defendants are high-ranking federal officials, including a cabinet member, who have, as a matter of policy, abandoned the prior

practice and adopted a concededly constitutional replacement.[10]  We understand this exception to mootness to be highly sensitive to the facts of a given case.  See, e.g., Already, LLC, No. 11-982, slip op. at 5-8.  HHS' denial of USCCB's proposal is attributable, at least in part, to HHS' shift in policy to a "strong preference" that TVPA contractors provide abortion and contraception services that USCCB was unwilling to provide.  The change has come about in part because of the different policy perspectives of a different President (and a different HHS) than the administration which originally granted the contract in 2006.

For these reasons, we believe by its terms the voluntary cessation exception does not apply.  We would, in any event, use our discretion not to exercise jurisdiction.  See, e.g., City of Mesquite, 455 U.S. at 288; Council of Carpenters, 284 F.3d at 18 n.3.  As in Council of Carpenters, under the circumstances of this case, "we think it wise to avoid an adjudication addressed to a policy that no longer applies."  284 F.3d at 18 n.3.

---

[10]  In saying so, we do not join the line of cases holding that when it is a government defendant which has altered the complained of regulatory scheme, the voluntary cessation doctrine has less application unless there is a clear declaration of intention to re-engage.  The Tenth Circuit in Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096 (10th Cir. 2010), provided a useful survey of this case law.  Id. at 1116-20, 1116 n.15; see also Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 981-82 (6th Cir. 2012); Mosley v. Hairston, 920 F.2d 409, 414-415 (6th Cir. 1990); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988); M. Redish, Moore's Fed. Practice, § 101.99[2].

B.        <u>"Capable of Repetition, Yet Evading Review"</u>

The second exception, more commonly invoked in cases involving expired contracts, is for conduct "capable of repetition, yet evading review."  <u>See</u>, <u>e.g.</u>, <u>Pub. Utils. Comm'n</u> v. <u>FERC</u>, 236 F.3d 708, 714 (D.C. Cir. 2001); <u>James Luterbach</u>, 781 F.2d at 602. The district court did not rely on this exception and the ACLUM's appellate brief has waived the issue, addressing the exception only once in a footnote.[11]

Had the exception been properly preserved, we would conclude it does not apply to this case.  "[T]he capable-of-repetition doctrine applies only in exceptional situations," <u>City of Los Angeles</u> v. <u>Lyons</u>, 461 U.S. 95, 109 (1983), where a plaintiff can show that "'(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.'" <u>Gulf of Me. Fisherman's Alliance</u> v. <u>Daley</u>, 292 F.3d 84, 89 (1st Cir. 2002) (quoting <u>Weinstein</u> v. <u>Bradford</u>, 423 U.S. 147, 149 (1975) (per curiam)).  Neither condition is met here.

As to the first, the ACLUM's challenge is not among the "inherently transitory" claims the Supreme Court has recognized as likely to evade review, <u>e.g.</u>, <u>Moore</u> v. <u>Ogilvie</u>, 394 U.S. 814, 816

_____

        [11]   Even there, the ACLUM argues "this action is not only capable of repetition but it <u>may</u> evade review if this case is dismissed as moot." (emphasis added).

(1969) (elections); <u>Roe</u> v. <u>Wade</u>, 410 U.S. 113, 125 (1973) (pregnancies); <u>Neb. Press Ass'n</u> v. <u>Stuart</u>, 427 U.S. 539, 542 (1976) (temporary restraining orders).  Nor has the ACLUM shown on these particular facts "a realistic threat that no trial court ever will have enough time to decide the underlying issue[]."  <u>Cruz</u> v. <u>Farquharson</u>, 252 F.3d 530, 535 (1st Cir. 2001).[12]  The HHS-USCCB contract was in effect for five and a half years, more than enough time to litigate the case, <u>Am. Rivers</u> v. <u>Nat'l Marine Fisheries Serv.</u>, 126 F.3d 1118, 1124 (9th Cir. 1997) (finding future challenges to superceded policy would not evade review where revised policy in effect for three years); <u>Ahmed</u> v. <u>Univ. of Toledo</u>, 822 F.2d 26, 28 (6th Cir. 1987) (finding challenged conduct in effect for four to five years would not evade review); <u>Valentino</u> v. <u>Howlett</u>, 528 F.2d 975, 980 (7th Cir. 1976) (same), and could have been challenged much earlier than the date on which the ACLUM filed suit.

On whether the HHS-USCCB contract is "capable of repetition," the ACLUM bears the burden and must show a "reasonable

---

[12]    Federal defendants also argue that the "capable of repetition, yet evading review" exception does not apply where, as here, the party invoking the exception fails to seek preliminary relief to ensure that its adversary's conduct does not render the case moot.  <u>See</u> <u>Newdow</u> v. <u>Roberts</u>, 603 F.3d 1002, 1009 (D.C. Cir. 2010), <u>cert.</u> <u>denied</u>, 131 S. Ct. 2441 (2011) ("The capable-of-repetition doctrine is not meant to save mooted cases that may have remained live but for the neglect of the plaintiff."); <u>see</u> <u>also</u> <u>Armstrong</u> v. <u>FAA</u>, 515 F.3d 1294, 1297 (D.C. Cir. 2008) (collecting cases).  Because there is a separate basis for withholding the exception, we do not decide this issue.

expectation" or "demonstrated probability," <u>Murphy</u> v. <u>Hunt</u>, 455 U.S. 478, 483 (1982) (per curiam), that it "will again be subjected to the <u>alleged illegality</u>," <u>Lyons</u>, 461 U.S. at 109 (emphasis added).   Our earlier discussion disposes of this point.   The HHS-USCCB contract has expired, the terms for TVPA grants have changed, and HHS has committed itself for the next three years to new grants that fund the full range of legally permissible abortion and contraceptive services.

IV.

When a case becomes moot on appeal, the established practice is to vacate the judgment below and remand with instructions to dismiss. <u>See</u>, <u>e.g.</u>, <u>Camreta</u> v. <u>Greene</u>, 131 S. Ct. 2020, 2034-35 (2011); <u>Arizonans for Official English</u>, 520 U.S. at 71; <u>Reid</u>, 369 F.3d at 627. "A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." <u>U.S. Bancorp Mortg. Co.</u> v. <u>Bonner Mall P'ship</u>, 513 U.S. 18, 25 (1994); <u>cf.</u> <u>Overseas Military Sales Corp., Ltd.</u> v. <u>Giralt-Armada</u>, 503 F.3d 12, 17 (1st Cir. 2007) ("Where a settlement occurs, or the losing party declines to pursue an appeal, no vacatur is appropriate.") (citations omitted).

The expiration of a contract on its own terms constitutes such a mooting event. <u>See</u> <u>Columbian Rope</u>, 142 F.3d at 1318; <u>James Luterbach</u>, 781 F.2d at 604; <u>Dan Caputo Co.</u> v. <u>Russian River Cnty.</u>

-25-

Sanitation Dist., 749 F.2d 571, 574 (9th Cir. 1984).  By vacating the judgment below, we eliminate its "binding effect," Deakins v. Monaghan, 484 U.S. 193, 200 (1988), and "clear[] the path for future relitigation" should it be necessary, United States v. Munsingwear, 340 U.S. 36, 40 (1950).  In short, "the rights of all parties are preserved," and "none is prejudiced by a decision which . . . was only preliminary."  Id. at 40.

We vacate the district court's judgment and remand with instructions to dismiss the case.  Each party shall bear their own costs.  So ordered.